NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2760-11T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

  v.

WASAN BROCKINGTON,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

February 18, 2015

APPELLATE DIVISION

Submitted June 3, 2014 — Decided February 18, 2015

Before Judges Fisher, Espinosa and Koblitz.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 10-08-1136.

Joseph E. Krakora, Public Defender, attorney for appellant (Monique Moyse, Designated Counsel, on the brief).

Andrew C. Carey, Acting Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Special Deputy Attorney General/Acting Assistance Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

Defendant appeals from his convictions and sentence for various drug offenses.  Among the issues raised is his challenge to testimony that was admitted regarding suspected drug

transactions that preceded the offenses for which he was charged. We reverse and remand for a new trial.

I

Defendant was convicted on eleven counts that charged him with third-degree offenses for possession of controlled dangerous substances (CDS), possession with intent to distribute, distribution, possession with intent to distribute within a school zone, distribution within a school zone for both cocaine and heroin, and conspiracy. The charges were based upon events that occurred on May 22, 2010, after New Brunswick police set up surveillance on Baldwin Street.

Defendant and his co-defendant, Kelvin Fitzpatrick,[1] filed several pretrial motions, including motions to compel the disclosure of the surveillance position of the officers; suppress defendant's statement; and sever the trials of the defendants. Each of these motions was denied following a Rule 104 hearing.

Defendants also filed a motion to bar the State from introducing "other crimes evidence" relating to uncharged drug transactions, which included observations of Fitzpatrick engaging in what was perceived to be six drug transactions in the weeks prior to the date of arrest. The trial judge questioned defense

---

[1] Fitzpatrick was jointly charged in counts one through eleven and separately in count twelve.

2

counsel as to the scope of the relief requested. Counsel for the co-defendant clarified that the evidence sought to be excluded was "[a]ny observations that Sergeant Quick made allegedly to my client making sales in this vacant lot to six people prior to May 22nd . . . . Not what happened that day." The trial judge conducted an analysis of the challenged evidence pursuant to State v. Cofield, 127 N.J. 328, 338 (1992), and concluded that the evidence of observations prior to May 22 would not be admitted in evidence.

Counsel for defendant subsequently asked whether the court's order would also apply to "the six alleged transactions that [] Sergeant Quick testified that occurred, that he thought had occurred that day, but he claims he couldn't see?" (emphasis added). The judge responded, "They're coming in. He's going to be able to testify as to his own personal observations and how he got to and why he arrested and why he didn't arrest." Defense counsel noted his objection, stating the evidence was "substantially more prejudicial than it [was] probative" because the actual transactions, which presumably occurred in the alley out of Sergeant Quick's sight, were not directly observed and the suspected buyers were not going to testify.

We summarize the testimony that was introduced pursuant to this ruling:

3

Sergeant John Quick was watching the area with binoculars when, for ten minutes beginning at 11:00 a.m., he saw defendant and Fitzpatrick engage in a series of six encounters with persons whom Sergeant Quick "believe[d] to be suspected buyers" of CDS. In each encounter, Sergeant Quick observed Fitzpatrick "meet with a suspected buyer" and have "a very short conversation" that was followed by a transfer of money from the suspected buyer to Fitzpatrick. Sergeant Quick witnessed Fitzpatrick give "the money" to defendant; defendant and "the suspected buyer" then walked down a driveway, out of the sergeant's sight, for "seconds to less than a minute." Sergeant Quick testified that this sequence was repeated with a total of six suspected buyers over the ten-minute period. He explained why he did not identify any of the suspected buyers at this point:

> I didn't keep track of that because at this point although I may have suspected there was illegal activity in that alleyway I didn't know what transpired there, so there were no arrests made.

[Emphasis added.]

Sergeant Quick then described transactions he observed:

Q. What did you see happen next?

A. I observed [defendant] give [K.C.] a bag of cocaine.

4

Q.   So you saw Mr. Brockington give [K.C.] cocaine on the sidewalk where the B[2] is?

A.   That's correct.

Q.   What did [K.C.] do with the bag of cocaine?

A.   He put that cocaine in his mouth.

. . . .

Q.   So [K.C.] walked away off Baldwin Street after he put the cocaine into his mouth?

A.   That's correct.

Q.   You didn't arrest anyone at that point even though you had seen drugs exchange hands, correct?

A.   That's correct.

Q.   And explain to the jury why you didn't arrest anybody at that point.

A.   Putting cocaine [in the mouth] is a common way for drug buyers to conceal evidence in the event the police get involved.  It's hard to retrieve.  Puts the officer's life in jeopardy.  It puts the buyer's life in jeopardy trying to retrieve the cocaine from their mouth, so we don't generally -- we don't make an arrest in that situation.

. . . .

Q.   After you saw [K.C.] walk down that driveway or alleyway off Baldwin Street did you see someone else

---

[2]  "B" represented the location on the map where the witness first saw defendant.

5

> approach Mr. Brockington and Mr. Fitzpatrick?
>
> . . . .
>
> A.   It was an older male, button-down shirt and blue jeans.  He walked up to [defendant], very short conversation, brief conversation, money was exchanged, and <u>I saw [defendant] take a bag of heroin</u> from his left pocket and hand it to this unknown <u>suspected buyer</u>.  The buyer started to walk away towards Remsen Avenue, open the bag of <u>suspected heroin</u> and snorted the <u>heroin</u> from the bag.
>
> . . . .
>
> Q.   And explain to the jury why you didn't make an arrest at that time.
>
> A.   At that point the evidence that was in that bag, <u>suspected heroin</u>, would be gone.  <u>We had no evidence at that point to substantiate the sale</u>.
>
> Q.   After the older male <u>snorted the heroin</u> and walked away did you see someone else approach Mr. Fitzpatrick and Brockington?
>
> A.   Yes, I did.
>
> [Emphasis added.]

Each of the transactions described above concluded without any arrest or seizure of any drugs.  There was no evidence introduced to corroborate Sergeant Quick's characterization of the items he observed as heroin or cocaine.

6

Sergeant Quick then described another exchange that occurred minutes later in which defendant gave a suspected buyer, later identified as E.J., two bags of heroin and two bags of cocaine. After this transaction, the officers arrested defendant, Fitzpatrick, and E.J. Detective Rosario Maimone, the arresting officer, testified that defendant ran into a driveway, threw down a newspaper and returned to the officers, who handcuffed defendant and retrieved the newspaper, which contained fifteen packs of heroin. As Fitzpatrick was being arrested, defendant called out that Fitzpatrick had "nothing to do with it, it's all my shit." When arrested nearby, E.J. was found to be in possession of two bags of heroin and two bags of cocaine.

Sergeant Quick was offered as a fact witness, not an expert witness. Yet, the prosecutor elicited the following testimony to buttress Quick's conclusions:

> Q. And I just want to establish this for the jury. In the course of your career and approximately 3,000 investigations you're familiar with what cocaine looks like and the way it's packaged versus the way heroin looks and the way that's packaged?
>
> A. That's correct.
>
> Q. So you were confident at this point you had seen a transaction of cocaine and heroin to this suspected buyer?
>
> A. That's correct.

7

No limiting instruction was requested or given as to Sergeant Quick's testimony regarding the encounters he described as drug transactions that preceded the transaction for which defendant was charged. To the contrary, the final instructions to the jury included the following: "[I]f I gave a limiting instruction as to how to use certain evidence that evidence must be considered by you for that purpose only. That also was not a situation that arose in the trial."

At trial, the State also called Lieutenant Daniel J. Muntone, who testified as an expert in CDS packaging and distribution. The hypothetical question posed to Lieutenant Muntone, ostensibly pursuant to State v. Odom, 116 N.J. 65 (1989), included three of the uncharged encounters, which Sergeant Quick had acknowledged could not be substantiated as drug sales:

> At approximately 11 a.m. suspect one is approached by a potential buyer on the street. Suspect one speaks with the buyer for several moments, receives cash from the buyer, walks the buyer down the street towards suspect two and hands the cash to suspect two. Suspect two then walks down a driveway with the buyer for less than a minute outside the view of surveillance. Upon exiting the driveway the buyer walks away and the suspects return to their original locations. This conduct is observed six times.

> At approximately 11:15 a.m. suspects one and two are approached by a potential buyer. Suspect two hands a suspended [sic] packet of heroin to the buyer and receives cash from the buyer. Suspect one stands nearby. The buyer

8

places <u>the heroin packet</u> in his mouth and walks away.

Within a minute suspects one and two are approached by another potential buyer. Suspect two receives cash from the buyer and hands the buyer <u>a bag of heroin</u>. Suspect one is standing nearby. The buyer snorts the contents of the bag into his nose as he walks away.

The description in the hypothetical of these encounters in which no drugs were recovered is identical to the following description included in the hypothetical of the transaction immediately preceding the arrest in which the drugs were seized, tested and available as evidence:

Almost immediately thereafter suspects one and two are approached by another potential buyer. Suspect two hands suspected packets of heroin to the buyer in exchange for cash. Suspect one is standing nearby. The buyer places <u>the heroin packets</u> into a pocket. Suspect two is then observed spitting <u>two packets of cocaine</u> into his hand and giving them to the buyer. The buyer places these packets in his pocket and walks away.

In his summation, the prosecutor also presented Sergeant Quick's uncorroborated opinions regarding the uncharged encounters as facts:

What else did you hear? You heard Sergeant Quick and <u>I think he testified pretty credibly</u> about what he saw, what he didn't see. Right? He said he saw these <u>six what he thought were transactions</u>. This is a guy who sat here, he's told you he's been a part of 3,000 plus investigations. He told you <u>he knows what he's looking for</u>. He's not like you or I if

9

we were out on Baldwin Street. We might not recognize a drug deal took place. He's out there. He said based upon my experience he thought those first six times when Fitzpatrick took the money, gave it to Brockington, <u>I thought they were drug deals</u>. You know what? <u>I didn't order arrests at that time because I don't think we had evidence</u> and because I didn't have any way to prove to a jury at some point that drug deals took place, so I waited, that's when <u>I saw three additional times that man, Mr. Brockington, take drugs out of his pocket, give it to someone in exchange for money.</u>

The jury convicted defendant of the eleven counts that charged him with conspiracy and CDS offenses and acquitted him on a count that charged him with resisting arrest.

The trial judge granted the State's motion for the imposition of an extended term. After erroneously imposing two extended sentences, <u>N.J.S.A.</u> 2C:44-5(a)(2), the judge granted defendant's application for reconsideration and resentenced defendant to an aggregate term of ten years, subject to a five-year period of parole ineligibility.

II

Defendant appeals, arguing:

I. THE ADMISSION OF EVIDENCE OF BAD ACTS VIOLATED <u>N.J.R.E.</u> 404(b) AND DEPRIVED MR. BROCKINGTON OF HIS RIGHT TO A FAIR TRIAL; THE COURT'S FAILURE TO GIVE A LIMITING INSTRUCTION WAS ERROR.

II. PROSECUTORIAL MISCONDUCT WARRANTS A REVERSAL OF MR. BROCKINGTON'S CONVICTIONS (Not Raised Below).

10

III. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING MR. BROCKINGTON'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS SEVEN, EIGHT, NINE, AND TEN, THE SCHOOL ZONE OFFENSES.

IV. THE TRIAL COURT ERRED BY RULING THAT THE STATE DID NOT HAVE TO DISCLOSE THE POLICE SURVEILLANCE LOCATION.

V. THIS MATTER MUST BE REMANDED FOR RESENTENCING.

In this appeal, defendant broadly challenges the admission of evidence regarding those transactions as violating N.J.R.E. 404(b). It is not disputed that the trial judge did not conduct a Cofield analysis as to whether these transactions were admissible pursuant to N.J.R.E. 404(b). Rather, the State argues that the trial court properly admitted the evidence of the exchanges on the day of defendant's arrest under an N.J.R.E. 403 analysis because it was relevant and intrinsic to the crime itself.

Sergeant Quick's testimony regarding the suspected transactions prejudicially exceeded the bounds of permissible lay opinion testimony. That prejudice was amplified by the use of Sergeant Quick's conclusions in both the hypothetical question posed to the expert and the prosecutor's summation. We therefore agree that a reversal is required based upon the errors challenged in Points I and II, and therefore do not address Points III and V. After reviewing the arguments and record in light of the applicable law, we are satisfied that the arguments raised in

11

Point IV lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

III

We first consider whether Sergeant Quick's testimony, which was replete with opinions that specific drugs were being exchanged, fell within the permissible scope of lay witness testimony, N.J.R.E. 701.

In State v. McLean, 205 N.J. 438 (2011), a police officer who conducted surveillance in a drug investigation testified about his observations of what he characterized as "suspected hand-to-hand drug transactions," referring as well to "suspected buyer[s]," "suspected drugs," and a "suspected drug stash."  Id. at 445-46. In reversing defendant's conviction, the Supreme Court clarified the permissible scope of lay opinion testimony, specifically addressing "whether a police officer, who observed [a defendant] engage in behavior that the officer believed was a narcotics transaction, should have been permitted to testify about that belief pursuant to the lay opinion rule."  Id. at 443.  Although McLean was decided after the trial here was concluded, its reasoning rests upon well-established principles that govern lay opinion testimony and which are properly applied here.

As the Court observed, lay opinion testimony is governed by N.J.R.E. 701, which permits a lay witness's "testimony in the form

12

of opinions or inferences . . . if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." Fed. R. Evid. 701 is similar to N.J.R.E. 701 in requiring that lay opinion be rationally based upon the perception of the witness and helpful to the trier of fact.[3] Addressing the first requirement that the opinion be rationally based upon perception, the Second Circuit stated, "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005), cert. denied, 552 U.S. 1154, 128 S. Ct. 1100, 169 L. Ed. 2d 831 (2008).

It is evident the testimony here does not satisfy this criteria. The average person cannot discern whether a package contained heroin or cocaine based on no more than the observations Sergeant Quick described. This is highlighted by the direct examination, which established that Sergeant Quick was "confident . . . [he] had seen a transaction of cocaine and heroin" based on his three thousand prior investigations and familiarity with the appearance and packaging of both heroin and cocaine.

---

[3] In 2000, the federal rule was amended to provide that testimony cannot be received as lay opinion if it is based on "scientific, technical, or other specialized knowledge." See Fed. R. Evid. 701(c).

13

In <u>McLean</u>, <u>supra</u>, the Court described "the boundary line that separates factual testimony by police officers from permissible expert opinion testimony" as follows:

> On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses. <u>Fact testimony has always consisted of a description of what the officer did and saw</u>, including, for example, that defendant stood on a corner, engaged in a brief conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag. <u>Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought" or "suspected</u>," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge.
>
> [205 <u>N.J.</u> at 460 (emphasis added) (citations omitted).]

The Court explicitly rejected the argument "that there is a category of opinion that lies between [expert and lay opinions] that authorizes a police officer, after giving a factual recitation, to testify about a belief that the transaction he or she saw was a narcotics sale." <u>Id.</u> at 461. The Court reasoned that such an approach would "transform[] testimony about an individual's observation of a series of events . . . into an opportunity for police officers to offer opinions on defendants' guilt." <u>Ibid.</u>

14

The Court's explanation of why the testimony in McLean was impermissible has resonance here:

> [T]he police officer in this matter was not qualified to testify as an expert. As a result, the reference in the question to his training and experience, coupled with the request that he testify about his belief as to what had happened, impermissibly asked for an expert opinion from a witness who had not been qualified to give one. . . . [A]s we made clear in [State v. Nesbitt, 185 N.J. 504, 514-16 (2006)], the implications of what he said he saw were not outside the common understanding of the jurors.
>
> [Id. at 461-62.]

The testimony here exceeded the bounds of permissible lay opinion testimony even more egregiously. Like the testimony in McLean, the officer here was asked about his training and experience in an apparent effort to proffer expert testimony from a lay witness. But here, the officer not only described what he suspected, he stated his conclusions of the specific drugs being transferred, crossing the line from suspicion to fact, supported only by his interpretation of what he had observed.[4]

Moreover, the prejudice created by this testimony did not end with its admission. Rather, the prejudice was exacerbated by the

---

[4] See State v. Sowell, 213 N.J. 89, 106-07 (2013) (finding improper an expert opinion that was not limited to the facts in a hypothetical but included the opinion that "an exchange of narcotics took place").

15

inclusion of these inadmissible opinions as facts in both the hypothetical to the expert and in the prosecutor's summation.

Expert opinion in cases like this is not objectionable "as long as the expert does not express his opinion of defendant's guilt but simply characterizes defendant's conduct based on the facts in evidence in light of his specialized knowledge." Odom, supra, 116 N.J. at 79 (emphasis added). The Court observed that, "in proffering the opinion of an expert in this kind of case, the hypothetical question should be carefully phrased to refer only to the testimony and evidence adduced." Id. at 81 (emphasis added). By including Sergeant Quick's unsupported conclusions and placing them on a par with the drug transaction that led to the arrest and seizure of drugs, the hypothetical blurred the distinction between fact and opinion, and tainted the expert opinion.

The prosecutor's treatment of this testimony in his summation added further to the prejudice. After improperly vouching for Sergeant Quick's credibility, see State v. Bradshaw, 195 N.J. 493, 510 (2008); State v. Frost, 158 N.J. 76, 85 (1999), the prosecutor urged the jury to accept his opinions as fact, saying, "[h]e's not like you or I," because after more than three thousand investigations, Sergeant Quick "knows what he's looking for" and he "thought they were drug deals." The prosecutor even elevated

16

the lack of corroborating evidence to a virtue, stating Sergeant Quick refrained from arresting defendant when he "didn't have any way to prove . . . that drug deals took place" until he observed three additional transactions.

We therefore conclude that the introduction of Sergeant Quick's inadmissible opinion testimony was prejudicial to defendant and that additional prejudice was caused by the State's use of this evidence in the hypothetical to the expert and in summation. We are convinced that the resulting prejudice deprived defendant of a fair trial and that his convictions must be reversed.

IV

We next turn to the question of whether, stripped of impermissible opinion, testimony of the conduct observed by the officer before the transaction that prompted defendant's arrest would be admissible at his retrial. Our dissenting colleague opines that, without proof the earlier encounters resulted in the transfer of drugs, a principled analysis requires the exclusion of such "other-crimes" evidence under N.J.R.E. 404(b). He further concludes such testimony fails to meet the bar set in State v. Rose, 206 N.J. 141 (2011), for the admission of "intrinsic evidence" under N.J.R.E. 403 and, in any case, its undue prejudice substantially outweighs any probative value.

17

Because the issue here concerns the admissibility of uncharged bad conduct, we note the Court's instruction in <u>Rose</u>:

> The <u>threshold determination</u> under <u>Rule</u> 404(b) is whether the evidence relates to "other crimes," and thus is subject to continued analysis under <u>Rule</u> 404(b), <u>or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy</u>, most importantly <u>Rule</u> 403.
>
> [<u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 179 (emphasis added).]

<u>See also</u> <u>State v. Sheppard</u>, 437 <u>N.J. Super.</u> 171, 193 (App. Div. 2014) ("If it is intrinsic evidence, then <u>N.J.R.E.</u> 404(b) does not apply because the evidence does not involve some other crime, but instead pertains to the charged crime.").

Guided by the parameters of "intrinsic evidence" adopted in <u>Rose</u>, we are satisfied that the observations of the officers prior to the arrests constitute "intrinsic evidence" of the conspiracy and possession with intent charges against defendant. Since the evidence is properly subject to an analysis under <u>N.J.R.E.</u> 403 and meets the criteria for admissibility under that rule, it is unnecessary to consider its admissibility under <u>N.J.R.E.</u> 404(b).[5]

---

[5] Both in the trial court and here, the State argued this evidence was admissible under <u>N.J.R.E.</u> 403, a position apparently accepted by the trial court. We do not construe the State's argument that the evidence is admissible under <u>N.J.R.E.</u> 403 to be a concession that the evidence would fail to meet the more rigorous standard for admissibility under <u>N.J.R.E.</u> 404(b).

18

Our analysis begins with a review of the Court's decision in Rose, which our colleague has described as jettisoning the concept of res gestae and compelling the exclusion of the testimony at issue. At the heart of the mischief caused by the res gestae doctrine was the fact that it originated at a time when the law on hearsay and its exceptions was undeveloped and uncodified, yet continued to be relied upon as an independent basis for the admission of evidence after these rules were adopted.

The codification of the Rules of Evidence channeled admissibility questions into more precise analyses. In contrast, res gestae was ambiguous, casting a wide net that included hearsay statements "connected to an act because they were necessary in order to understand the events and had an inherent guarantee of trustworthiness." Rose, supra, 206 N.J. at 170. The doctrine lent itself to misuse as "a convenient vehicle" for sidestepping the hearsay rule to justify the admission of evidence that was not otherwise admissible under the rules. Id. at 168 (quoting 2 McCormick on Evidence § 268, at 245 (Broun ed., 6th ed. 2006)), 172-74. In Rose, the Court was unequivocal in its rejection of res gestae as a basis for admitting hearsay evidence:

> [R]es gestae appears unnecessary as an independent doctrine for the admission of hearsay evidence. Certainly our prior case law has suggested that the codified rules were drafted to reflect the permitted uses of common law res gestae evidence.

19

. . . Simply put, the hearsay exceptions provide a comprehensive and cohesive scheme for the permissible introduction of hearsay in our courts. . . . [H]earsay statements that do not conform to the exceptions specifically enumerated in the Rules of Evidence are not admissible.

[Id. at 174-75 (citations omitted).]

Historically, res gestae was also used as a means of admitting "evidence of other acts." Id. at 172. In contrast to the death knell Rose rung for the use of res gestae to admit hearsay evidence not admissible under the rules, the Court drew a distinction between evidence improperly admitted pursuant to an "enlarged" version of the res gestae doctrine and "intrinsic evidence," a concept which, the Court recognized, was difficult to identify but should survive. Id. at 176-77.

Significantly, the Rose Court did not limit the admissibility of uncharged bad acts to evidence that meets the Cofield test for admissibility under N.J.R.E. 404(b). Instead,

[E]vidence that is intrinsic to the charged crime is exempt from the strictures of Rule 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under Rule 404(b) because it is not "evidence of other crimes, wrongs, or acts." See 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 445 (1978) ("One of the key words in determining the scope of Rule 404(b) is 'other'; only crimes, wrongs, or acts 'other' than those at issue under the pleadings are made inadmissible under the general rule.").

20

Thus, evidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly the Rule 403 balancing test.

[Id. at 177-78 (emphasis added).]

The Court recognized the implications of subjecting such evidence to the less rigorous standard of N.J.R.E. 403:

[C]haracterization of evidence as "intrinsic" significantly affects the calculus because the principle animating Rule 403 is that relevant evidence is admissible unless its probative value is substantially outweighed by a negative feature of the evidence, whereas Rule 404(b) operates from the premise that evidence of other bad acts is inadmissible unless proffered for a proper purpose.[6] It is therefore more likely that evidence of uncharged misconduct will be admitted into evidence if it is considered intrinsic to the charged crime and subject only to Rule 403 than if it is not considered intrinsic evidence and subject to both Rule 404(b) and Rule 403.

[Id. at 177-78.]

Moreover, the Court predicted that its holding would have little impact upon evidentiary rulings:

"'As a practical matter, it is unlikely that our holding [adopting the doctrine of

_____

6 Although the Rose Court noted that N.J.R.E. 404(b) "is often described as one of exclusion," 206 N.J. at 179, it instructed that N.J.R.E. 404(b) should not be regarded as "containing an exhaustive list of the non-propensity purposes permitted of other crime evidence," and further stated "there is no reason that our courts cannot allow, under our Rule 404(b), evidence to be admitted for a similar 'necessary background' or, as otherwise stated, 'the need to avoid confusing the jury,' non-propensity purpose," id. at 181 (emphasis added).

21

> intrinsic evidence in place of both res gestae
> and the inextricably intertwined doctrine]
> will exclude much, if any, evidence that is
> currently admissible as background or
> "completes the story" evidence under the
> inextricably intertwined test.'"
>
> [Id. at 180 (quoting United States v. Green,
> 617 F. 3d 233, 248-49 (3d Cir.), cert. denied,
> __ U.S. __, 131 S. Ct. 363, 178 L. Ed. 2d 234
> (2010)).]

As the Court acknowledged, the term "intrinsic" is not easy to define with precision. Id. at 178. To address this difficulty, the Court adopted the test articulated in Green, supra, 617 F.3d at 248-49, limiting "intrinsic evidence" to "two narrow categories of evidence." Rose, supra, 206 N.J. at 180 (quoting Green, supra, 617 F.3d at 248). The first category applies to evidence that "directly proves" the charged offense. Ibid. The operative factor is whether the evidence has probative value as to the charged offense. The Court explained,

> This gives effect to Rule 404(b)'s
> applicability only to evidence of "other
> crimes, wrongs, or acts." If uncharged
> misconduct directly proves the charged
> offense, it is not evidence of some "other"
> crime.
>
> [Ibid. (quoting Green, supra, 617 F.3d at 248-
> 49).]

The Court adopted Green's definition of the second category of intrinsic evidence, stating "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic

22

if they facilitate the commission of the charged crime."  Ibid.
(quoting Green, supra, 617 F.3d at 249).

In our view, the observations of the surveillance officers here fall within the first category of intrinsic evidence because they "directly prove" the charged offenses.  Such evidence, even though inconclusive as to all the elements of the charged offenses, is admissible because it has probative value as to one or more of the statutory elements the State must establish beyond a reasonable doubt.[7]  This principle is illustrated in the caselaw that has drawn and refined the distinction between areas when expert testimony is permitted and not allowed in drug cases.

"Courts widely agree that expert testimony about drug-trade practices is admissible," State v. Summers, 176 N.J. 306, 312 (2003), because we expect jurors to lack the familiarity with such practices that would allow them to intelligently assess the

---

[7]  Relevancy consists of probative value and materiality.  Probative value "is the tendency of the evidence to establish the proposition that it is offered to prove." . . . Evidence need not be dispositive or even strongly probative in order to clear the relevancy bar. It "need only have some tendency to prove a material fact."  The inquiry is "whether the thing sought to be established is more logical with the evidence than without it."

[State v. Buckley, 216 N.J. 249, 261 (2013) (citations omitted).]

23

significance of facts in evidence.  See Sowell, supra, 213 N.J. at 100.  Therefore, expert testimony is permissible "to inform [the jury] about the nuanced techniques utilized by drug peddlers who seek to shield themselves from liability by concealing or obfuscating their drug possession and distribution activities." Nesbitt, supra, 185 N.J. at 514.

In Sowell, the Court reviewed some of the topics considered to be beyond the ken of laymen and thus an appropriate area for expert testimony, such as: "how a person's actions fit into a drug distribution scheme when the defendant had no personal contact with the drugs or money exchanged," Sowell, supra, 213 N.J. at 100; "the roles that participants play in street-level drug transactions, such as 'why drug dealers use juveniles as "mules" to carry drugs,'" ibid. (quoting State v. Berry, 140 N.J. 280, 301-02 (1995)); and "the difference between drugs possessed for distribution as opposed to personal use, or how drug traffickers package and distribute illegal drugs," ibid.  See also Summers, supra, 176 N.J. at 315-17; State v. Walker, 385 N.J. Super. 388, 407 (App. Div.) (expert permitted to testify regarding customs and behaviors of drug dealers, including opining that defendant had intent to distribute CDS based in part on fact doors were barricaded), certif. denied, 187 N.J. 83 (2006).

24

However, consistent with the line of authority that includes both <u>Nesbitt</u> and <u>McLean</u>, the Court observed, "the case law makes clear that it is not proper to present expert testimony about straightforward but disputed facts." <u>Sowell</u>, <u>supra</u>, 213 <u>N.J.</u> at 100. In <u>Nesbitt</u>, the Court concluded there was no need for an expert "to explain the straightforward manner" of transactions in which a defendant was "observed directly handing something to the alleged purchaser and receiving what appeared to be payment in return." <u>Nesbitt</u>, <u>supra</u>, 185 <u>N.J.</u> at 516; <u>see also</u> <u>State v. Reeds</u>, 197 <u>N.J.</u> 280, 298-99 (2009).

An example of this distinction is found in <u>State v. Baskerville</u>, 324 <u>N.J. Super.</u> 245, 247-48 (App. Div. 1999), <u>certif. denied</u>, 163 <u>N.J.</u> 10 (2000), which is cited with approval in <u>Sowell</u>, <u>supra</u>, 213 <u>N.J.</u> at 101; <u>McLean</u>, <u>supra</u>, 205 <u>N.J.</u> at 452; and <u>Nesbitt</u>, <u>supra</u>, 185 <u>N.J.</u> at 516. The defendant in <u>Baskerville</u> was charged with two offenses arising from a single transaction: distribution of CDS and distribution in a school zone. <u>Id.</u> at 246-47. The State's proofs included both evidence of the distribution that was the subject of the indictment and a surveillance officer's observations of a similar prior, but uncharged, transaction in which no drugs were recovered.

Baskerville and two other males were observed hanging about a vacant lot when a female approached. After the female walked

25

up to them and engaged in conversation, Baskerville walked away to an automobile parked in the vacant lot. He bent down, reached under the body of the vehicle and pulled out a brown paper bag. Baskerville removed something from the bag, replaced the bag underneath the car, and returned to the female. The officer testified, "the female handed [Baskerville] what I believe was paper money in exchange for whatever it was that he took from under the car." Id. at 248. No arrests were effected at this time; no drugs were recovered from any of the participants and Baskerville was not charged with this suspected distribution.

Shortly thereafter, the officer observed a male approach Baskerville and the two other males. Again, after a conversation, Baskerville walked to the vehicle, reached up under the car to get the bag, removed something from the bag and walked back to the male who had approached him. The officer testified that "a similar exchange took place where Baskerville received what I believed was money from [the male], paper money in exchange for the item or items that he had taken from within the bag." Ibid. After this transaction, the police arrested Baskerville and the male. Nine vials of cocaine were recovered from the male. Id. at 249. Baskerville had $897 in cash but no drugs were found either on him or near the car. Id. at 250.

26

The State presented hypothetical questions to an expert witness that incorporated the observations of Baskerville's actions with the female as well as the transaction that immediately preceded the arrests. Id. at 254-56. The expert witness opined that both were sales of narcotics. Id. at 255-56. We concluded that expert testimony regarding these transactions was "fatally beyond the pale of the permissible." Id. at 257.

We observed that the fact testimony provided "factual details and perceptions from which the jury could validly have inferred that one or two incidents of drug distribution had occurred." Id. at 262 (emphasis added). Although ambiguous, permitting inferences of both guilt and innocence, the facts were straightforward.

> There was nothing arcane about the question before this jury: Did defendant distribute drugs or not? Apart from furnishing expert assistance in understanding the incidents of drug trafficking, the State was not entitled to give the jury a non-factual basis for reaching a verdict on this entirely factual question. The fact-witness testimony should have spoken for itself. In the State's attempt to fill the unmistakable gaps in that testimony, and to strengthen the obvious weaknesses of its case, the prosecution could not validly suggest, through its expert witness, stronger inferences regarding the ultimate question than the fact testimony itself would support. In doing so, the State added an irredeemable element of undue prejudice to the trial.

27

> In sum, on the simple--up or down--factual issue in this case, the jury needed no assistance from an expert witness. <u>The testimony of the State's fact witnesses . . . was either adequate to lead to a guilty verdict or it was not.</u>
>
> [<u>Id.</u> at 263 (emphasis added).]

<u>See also</u> <u>State v. Thompson</u>, 405 <u>N.J. Super.</u> 76, 84-85 (App. Div.), <u>certif. denied</u>, 199 <u>N.J.</u> 133 (2009).

Both the fact-witness testimony in <u>Baskerville</u> and the observations of defendant's conduct at issue here were inconclusive, containing "unmistakable gaps" in the proof that drug transactions were consummated. Yet, those gaps did not render the evidence inadmissible. Implicit in the conclusion that the State was not entitled to introduce expert testimony to bolster such evidence is the unchallenged premise that the State is entitled to present evidence that permits inferences relevant to the charged conduct though it falls short of conclusively proving all the elements of a criminal offense. As we said, the fact-witness testimony must speak for itself. The jury is not only permitted, but entirely capable, to draw what inferences it deems appropriate based upon the facts it finds have been proven. <u>See</u> <u>Sowell</u>, <u>supra</u>, 213 <u>N.J.</u> at 101-02.[8]

---

[8] We further disagree with our dissenting colleague that if this evidence is admitted, it should be subject to a limiting instruction that the jurors are not to draw any inference of guilt.

28

Guided by these principles, we turn to the evidence here. Sergeant Quick observed defendant and Fitzpatrick engage in a pattern of behavior that was repeated several times within a relatively short period on the day of their arrest. In each encounter, Sergeant Quick observed Fitzpatrick have "a very short conversation" with a third party that was followed by a transfer of money from that person to Fitzpatrick, who gave the money to defendant. Defendant then walked down a driveway with the third party, reappearing less than a minute later. The officer also observed three incidents in which a third party walked up to defendant, engaged in a short conversation and handed defendant money. Defendant then handed the third party an item. The last of these incidents precipitated defendant's arrest and the recovery of drugs from both defendant and the purchaser.

Defendant was charged with counts alleging that he conspired with Fitzpatrick to possess the CDS and to possess CDS with intent to distribute. He was also charged with substantive offenses of possession with intent to distribute. Evidence that he and Fitzpatrick were present at that location, meeting with a string of individuals and apparently engaging in coordinated transactions, was probative of his intent, an element that had to

---

The standard charge regarding jurors' role as finders of the facts is sufficient.

29

be proven for the four counts that charged him with possession with intent to distribute and possession with intent to distribute in a school zone, as well as the conspiracy count.

Because the evidence serves to "directly prove" elements of the charged offenses, it falls within the first category of intrinsic evidence defined in Green, supra, 617 F.3d at 248-49, and adopted in Rose, supra, 206 N.J. at 180. See also United States v. Gibbs, 190 F.3d 188, 217-18 (3d Cir. 1999), cert. denied, 528 U.S. 1131, 120 S. Ct. 969, 145 L. Ed. 2d 840 (2000). Accordingly, the evidence is subject only to a N.J.R.E. 403 analysis, and not an N.J.R.E. 404(b) analysis. See Rose, supra, 206 N.J. at 177-78; see also State v. Skinner, 218 N.J. 496, 517 n.5 (2014) (citing Rose, the Court observed that evidence "such as an admission or details that . . . dovetail with the facts of the case" constitutes direct proof of the charged offense, which "should be analyzed for relevance under N.J.R.E. 401 and evaluated under N.J.R.E. 403's standard for prejudice, and not the standard for prejudice under a Cofield analysis").

The evidence here is clearly relevant to material facts at issue in the determination of defendant's guilt on the charged offenses. Therefore, the question is whether the evidence should be excluded because "its probative value is substantially outweighed by the risk of . . . undue prejudice," N.J.R.E. 403.

30

Our colleague opines that the evidence must be excluded under this test. We reach a contrary conclusion.

"'The mere possibility that evidence could be prejudicial does not justify its exclusion.'" State v. Long, 173 N.J. 138, 164 (2002) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)). Even when evidence is "highly damaging" to a defendant's case, "this cannot by itself be a reason to exclude otherwise admissible and probative evidence." State v. Frost, 242 N.J. Super. 601, 620-21 (App. Div.), certif. denied, 127 N.J. 321 (1990). "'Evidence claimed to be unduly prejudicial is excluded only when its "probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the issues in the case.'" Long, supra, 173 N.J. at 163-64 (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

Here, the testimony regarding defendant's earlier actions had no "inherently inflammatory potential." The actions merely mirrored the conduct that was the basis of the charges. The jury could accept the testimony as proof of defendant's intent and participation in a conspiracy or reject it as inadequate. The evidence had no capacity to divert them from a "reasonable and fair evaluation" of the issues. We therefore conclude that the probative value of the evidence is not outweighed, let alone

31

"significantly outweighed," by undue prejudice, and may be admissible at the trial that follows.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2760-11T2

**FISHER, P.J.A.D., concurring in part and dissenting in part.**

I agree we must reverse and remand for a new trial because Sergeant Quick was erroneously permitted to speculate that defendant and co-defendant Kelvin Fitzpatrick engaged in unlawful drug transactions within ten or so minutes before their arrest. Our central disagreement, and the reason for my dissent, is that my colleagues would, at the next trial, permit testimony about the earlier events and only prevent the officer's expression of his belief that drugs were then transferred. In other words, the majority would permit a sanitized version at the next trial, preventing the officer from saying, for example, he saw defendant give one man "a bag of cocaine" and another "a bag of heroin." I agree that State v. McLean, 205 N.J. 438 (2011), compels that result. But I disagree that any testimony about the earlier events should be permitted or, at least, not without a cautionary instruction that the jury not infer these earlier events constituted unlawful drug transactions. By allowing a sanitized version without cautionary instructions, the majority has authorized the State to do indirectly what we are unanimous in concluding it may not do directly. In short, the sanitized version has little or no probative value and packs the same significant prejudicial wallop that compels today's unanimous holding.

To amplify, it is helpful to examine the application of the Rules of Evidence to the testimony in question in both its sanitized and un-sanitized form. Consideration must, of course, start with the Supreme Court's jettisoning of the res gestae doctrine in State v. Rose, 206 N.J. 141, 182 (2011). In "end[ing] the practice of invoking 'res gestae' as an explanation for the admission of evidence, in circumvention of the application of the formal Rules of Evidence," ibid., the Court left no doubt that testimony regarding a defendant's bad conduct may be admitted only through application of N.J.R.E. 404(b) — if the bad act is "other" than the charged offense — or through application of N.J.R.E. 401, 402 and 403 — if the proponent claims the testimony is "intrinsic" to the charged offense, Rose, supra, 206 N.J. at 177-78.

The State does not argue in this appeal that Sergeant Quick's testimony about the prior events constituted evidence of "other crimes, wrongs or acts" admissible pursuant to N.J.R.E. 404(b). Through this silence, we must assume the State concedes this testimony could not be properly admitted pursuant to N.J.R.E. 404(b) and, indeed, the judge did not conduct a Cofield analysis of this testimony.[1] Accordingly, testimony regarding the earlier suspected transactions, whether sanitized or not, is admissible

---

[1] State v. Cofield, 127 N.J. 328, 338 (1992).

2

only if it falls within the "intrinsic evidence" concept defined in Rose, supra, 206 N.J. at 177-82.

As the Court recognized in Rose, what constitutes intrinsic evidence was once thought to be that which was "inextricably intertwined" with the charged offenses. Id. at 179. Finding that phrase unworkable, the Rose Court adopted a clearer definition by following United States v. Green, 617 F.3d 233, 248 (3d Cir.), cert. denied, __ U.S. __, 131 S. Ct. 363, 178 L. Ed. 2d 234 (2010), in which the court "reserve[d] the 'intrinsic' label for two narrow categories of evidence." The first category permits evidence that "'directly proves' the charged offense," and the second consists of "'uncharged acts performed contemporaneously with'" the charged crime and which "facilitate the commission of the charged crime." Id. at 248-49 (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)). Our Supreme Court obviously intended that these categories be constrictively applied by describing "Green's tight description of intrinsic evidence" as that which "narrows the field of uncharged misconduct" excluded "from 404(b)'s channeled analysis." Rose, supra, 206 N.J. at 181 (emphasis added).

In considering how these definitions have been applied in the past, I would initially observe that Rose did not involve evidence that was arguably intrinsic. There, the defendant was charged

3

with a murder he arranged while in jail and "about to go to trial on earlier charges that he had attempted to murder the victim." Id. at 145. The Court considered "whether evidence of defendant's previous indictment and incarceration on the pending attempted murder charges was admissible in defendant's trial for murder," and concluded that N.J.R.E. 404(b) permitted its admission. Rose, supra, 206 N.J. at 145-46. The Supreme Court's disposition of the appeal, therefore, did not require consideration of whether the disputed evidence was intrinsic and, consequently, what is said about intrinsic evidence may be fairly labeled dictum — but it is dictum to which we must consider ourselves bound. See Lehigh Valley R.R. Co. v. Chapman, 35 N.J. 177, 187, cert. denied, 368 U.S. 928, 82 S. Ct. 364, 7 L. Ed. 2d 192 (1961); State v. Breitweiser, 373 N.J. Super. 271, 282-83 (App. Div. 2004), certif. denied, 182 N.J. 628 (2005).

Bowie and Green — the cases that informed our Supreme Court's definition of intrinsic evidence — provide examples of how the two slender categories are to be applied. In neither case was the testimony in question found intrinsic.

In Bowie, the defendant was charged with possession of counterfeit bills on May 16; at trial, the government was permitted to show the defendant was in possession of counterfeit bills on April 17. 232 F.3d at 926. The court of appeals recognized the

4

counterfeit bills the defendant possessed on April 17 could not have been those he possessed on May 16 because the former were seized by agents prior to May 16. Id. at 929. And, because the indictment only charged defendant with possession of counterfeit bills on May 16, the evidence of possession of other counterfeit bills on an earlier occasion was not intrinsic and was found to be admissible only, if at all, as 404(b) "other crimes" evidence. Ibid.

Green also provides a rather clear-cut example of the limits of intrinsic evidence. There, in the course of committing a crime for which the defendant was charged — attempted CDS possession with the intent to distribute — the defendant also engaged in communications regarding an attempt, for which he was not indicted, to acquire dynamite to kill an undercover officer. Green, supra, 617 F.3d at 236-37. The government sought admission of evidence regarding the defendant's pursuit of dynamite on the ground that it was "'intrinsic evidence' concerning the charged cocaine offense." Id. at 237. The district judge agreed and, therefore, did not conduct a 404(b) analysis. Ibid. Recognizing this evidence gave every appearance of being "inextricably intertwined" with the evidence that was admissible to prove the charged offense — because the conversations about both occurred at the same time — the court of appeals came to the realization that the

5

"inextricably intertwined" standard was "elusive and unhelpful." Id. at 246. The court ultimately determined that its definition of the two categories of intrinsic evidence, which our Supreme Court adopted in Rose, led to the "straightforward" result that "[e]vidence of Green's threat to kill [the undercover officer] with dynamite was not intrinsic evidence" of the drug charge. Id. at 249. That is, evidence of the attempt to procure dynamite "did not directly prove that Green attempted to possess cocaine with intent to distribute," and "it did not in any meaningful way facilitate his attempt to procure cocaine . . . — the only crime with which he was charged." Ibid. (emphasis added).

Here, the evidence in question — testimony that Sergeant Quick observed what he only suspected were a half-dozen CDS transactions within minutes before the acts charged in the indictment — comes closer but, in my view, eludes Rose's constricted definition of intrinsic evidence. Even on the ground asserted by my colleagues — the earlier events were relevant in proving defendant's intent, ante at __ (slip op. at 29-30) — it is difficult to understand how, without proof CDS was exchanged, the earlier events materially contribute to this element of the offense; as already observed, Sergeant Quick conceded he had "no evidence at that point to substantiate the sale[s]" he believed he had witnessed were actually unlawful drug transactions.

6

The second intrinsic evidence category permits the admission of "'uncharged acts performed contemporaneously with the charged crime [that] facilitate the commission of the charged crime.'" Rose, supra, 206 N.J. at 180 (quoting Green, supra, 617 F.3d at 249). The testimony in question does not fit this category. The prior unsubstantiated transactions were not exactly "contemporaneous," because they preceded the transaction that led to defendant's arrest, although they were certainly close in time. And, because nothing definite could be said about those events, it cannot be said they "facilitate[d]" the crimes charged. Ibid. Green, upon which Rose relied, held the link between the challenged evidence and the crime charged must be "meaningful." Green, supra, 617 F.3d at 249. Because the officer conceded an absence of proof as to what previously transpired, there is no meaningful link between the testimony in question and the crimes charged.

Again, the State has not argued the testimony in question qualifies as prior bad conduct admissible pursuant to N.J.R.E. 404(b), and I reject the argument that the testimony, whether or not sanitized, qualifies as intrinsic evidence as defined by Rose or the federal authorities upon which Rose relies. I do not think, however, we need stray very far into these murky waters because, even if the testimony is intrinsic, its prejudicial effect far outweighs any probative value it may arguably possess.

7

As observed earlier, even if the testimony were to invoke consideration of N.J.R.E. 404(b), the trial judge did not perform a Cofield analysis. If she had, a principled analysis would have led to the exclusion of this testimony on that ground. Even assuming the first two Cofield factors[2] favored admission, the third — "[t]he evidence of the other crime must be clear and convincing," Cofield, supra, 127 N.J. at 338 (internal quotation and citation omitted) — cannot seriously be offered as support for admission; Sergeant Quick acknowledged an arrest could not then be made because, in his own words, he had "no evidence at that point to substantiate th[os]e sale[s]." The position that these earlier events were prior crimes — a position never urged by the State in this appeal — is even less convincing when sanitized because then the testimony will not convey — or at least should not be permitted to convey — a venal connotation.

And, even if this testimony was either evidence of prior bad conduct or intrinsic to the offenses charged, a factor common to both analyses would preclude the testimony. That is, the fourth Cofield factor — "[t]he probative value of the evidence must not be outweighed by its apparent prejudice," ibid. (internal

---

[2]The first and second factors require that "[t]he evidence of the other crime must be admissible as relevant to a material issue" and "similar in kind and reasonably close in time to the offense charged." Cofield, supra, 127 N.J. at 338 (internal quotation and citation omitted).

8

quotation and citation omitted); see also State v. Skinner, 218 N.J. 496, 515 (2014) — is similar[3] to the N.J.R.E. 403 balancing test, and the application of the latter is, in the Rose Court's words, a "most important[]" part of the intrinsic evidence analysis. See Rose, supra, 206 N.J. at 177-78 (recognizing that whether evidence is intrinsic "lies in the cross hairs of the intersection" of N.J.R.E. 401 and N.J.R.E. 402, and "most importantly" invokes the balancing test set forth in N.J.R.E. 403). The probative value — if any — of the prior suspected drug sales was far outweighed by the prejudice caused in allowing Sergeant Quick to speculate about what he believed he witnessed prior to the transaction that triggered the arrests. Accordingly, the jury should not have been permitted to hear about these earlier episodes. By precluding from the next trial Sergeant Quick's speculation as to what he thought defendant and Fitzpatrick were doing prior to the drug transaction that led to their arrest, any probative value in that testimony is completely eliminated or, at best, cognizable only through a most strained application of the Rules of Evidence. To the extent any probative weight may be

---

[3] See Rose, supra, 206 N.J. at 160-61 (recognizing that the fourth prong of the Cofield test, which declares that the probative value of N.J.R.E. 404(b) evidence "must not be outweighed by its apparent prejudice," is "more exacting" than N.J.R.E. 403, "which provides that relevant evidence is admissible unless its probative value is substantially outweighed by the risk of undue prejudice"). See also State v. Sheppard, 437 N.J. Super. 171, 195 (App. Div. 2014).

assigned to the sanitized version, it is substantially outweighed by the prejudice defendant will suffer by its admission.

In short, I am in agreement with the majority that the admission of the un-sanitized version of Sergeant Quick's earlier observations severely prejudiced defendant and warrants the ordering of a new trial. I disagree that a sanitized version changes anything. Indeed, the sanitized version is every bit as pernicious because, in barring the officer's opinion about what he believed he saw, it allows the jury to draw that same conclusion; indeed, absent instructions, it is difficult to imagine a jury would not assume exactly what Sergeant Quick expressed during the first trial. Because the majority is not mandating that the next jury be instructed not to draw an inference that these earlier events constituted unlawful drug transactions, then, frankly, we may as well affirm because the prejudicial error we have identified will likely be repeated, only in a different way, the next time.[4]

---

[4]In a footnote, my colleagues mention that evidence which provides "'necessary background'" is admissible pursuant to <u>N.J.R.E.</u> 404(b), <u>see</u> <u>ante</u> at __ n.6 (slip op. at 21 n.6) (quoting <u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 181), but they do not hold — and, indeed, the State has not argued — that, when viewed as intrinsic, the testimony in question is admissible to provide context for other relevant evidence, to avoid confusing the jury, or to "complete the story." Were it otherwise, I would suggest the demise of res gestae, in Twain's words, was "greatly exaggerated."

To summarize, I agree with my colleagues that the judgment under review must be reversed and the matter remanded for a new trial, but I disagree with and dissent from the majority's express holding that a sanitized version of the earlier events may be admitted at the next trial. And I disagree with and dissent from the majority's holding that the judge need not instruct the jury the next time that it must not infer defendant and Fitzpatrick were previously engaged in unlawful drug transactions.[5]

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5]Whether this separate opinion is properly labeled may be arguable. As stated, all panel members agree the judgment must be reversed and the matter remanded for a new trial. That might suggest I am merely concurring in the court's judgment. But we disagree on the content of our mandate because we disagree about what evidence may be admitted at that new trial or, if the evidence is admitted, what jury instructions are required as a result. In any event, what is or is not a dissent is ultimately a question for the Supreme Court, not us. Triffin v. Mellon PSFS, 372 N.J. Super. 221, 226-27 (App. Div. 2004) (citing Stone v. Old Bridge Twp., 111 N.J. 110, 115-16 n.2 (1988)). An Appellate Division judge is incapable of creating or preventing an appeal as of right to our Supreme Court, pursuant to Rule 2:2-1(a)(1), simply by the label affixed to a separate opinion.