**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5556-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GREGORY J. HERBERT,

     Defendant-Appellant.

_____

> Argued October 28, 2020 – Decided December 18, 2020
>
> Before Judges Sumners and Geiger.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-01-0065.
>
> Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).
>
> Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Meredith L. Balo, of counsel and on the brief).

PER CURIAM

Defendant Gregory J. Herbert appeals an October 27, 2016 order that granted the State's motion to admit his custodial statement to police in evidence at trial, and an October 3, 2017 judgment of conviction and sentence for conspiracy to commit first-degree robbery, third-degree possession of a weapon for an unlawful purpose, and the lesser-included offenses of fourth-degree aggravated assault by pointing a firearm and disorderly persons theft. We reverse defendant's convictions and remand for a pretrial hearing and retrial.

We discern the following facts from the evidence presented at the joint trial of Herbert and co-defendant Kadeem I. Charles.[1] Herbert, Charles, and Michael Onyeagoro met at Charles's house for a party on December 19, 2013. Onyeagoro testified at trial that the trio left Charles's shortly after midnight to "discuss[] locations or persons that [they could] rob" and eventually decided to rob a gas station.[2]

---

[1] In our separate opinion in the companion appeal filed by Charles, we reversed Charles's convictions and remanded for a N.J.R.E. 104 hearing and retrial. State v. Charles, No. A-1136-17 (App. Div. Dec. 18, 2020).

[2] Onyeagoro pled guilty to second-degree conspiracy and turned State's witness.

2

The three went forward with the plan. At approximately 2:30 a.m., Onyeagoro distracted the gas station attendant by driving into the gas station and asking for gas. As the attendant pumped gas, Charles pointed a BB gun at him while Herbert stole computer equipment. The trio fled the scene.

Hillside Police Department received a "holdup alarm" from the BP gas station on Route 22 at 2:30 a.m. Police found Onyeagoro waiting for Herbert and Charles in his car nearby, which matched the description given by the gas station attendant. They observed a knife under the seat of the car and arrested Onyeagoro for possession of a weapon.

Information obtained from Onyeagoro led to the arrests of Charles in July 2014 and Herbert in August 2014. Police searched Charles's home in Irvington and seized two BB guns, a ski mask, a knife, clothing, and gloves.

Following his arrest in Vermont and return to New Jersey, Herbert was interviewed by Hillside Police Detective Sergeant Cosimo Tripoli after Herbert was read his Miranda[3] rights and waived those rights. Herbert denied being in Hillside at the time of the crimes or ever being in Onyeagoro's car.

After an already lengthy interrogation, police asked defendant: "You want to think about some stuff in mind for a few minutes? We'll step out

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-5556-17T4

maybe you just want to clear your head and think." To which defendant answered:

> No, I already cleared my head already. If you got the, you say you have the evidence, you say you have all the answers, then I guess only thing left for you to do I guess is go to court and we'll figure it out from there. I guess, I get a lawyer and then figure it out from there.

At this point, police did not stop the interview, ask for Herbert to clarify his statement, or leave the room. Similarly, Herbert stated, "[y]ou want me to say certain things and[] I wish I had the answers for you." Once again, police did not stop the interview or seek to clarify Herbert's statement. Herbert repeated that he wanted "to leave it up to the court" several more times during the interview.

In addition, police asked Herbert: "Okay. So before we end this today, anything else you want to say?" Herbert responded: "No, I don't have anything."

In January 2015, a Union County grand jury returned an indictment charging Herbert and Charles with the following offenses: first-degree robbery, N.J.S.A. 2C:15-1 (count one); first-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:15-1 (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three);

4

and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four).

The State moved to admit Herbert's custodial statement at trial. The trial court conducted a Miranda hearing on October 25, 2016.

The court found Herbert to be "calm and cooperative" and "appeared to be educated, articulate, and intelligent." During the interview, Herbert was questioned for over three hours. The court noted that "while persistent, the officers did not raise their voice, threaten Mr. Herbert, or try to trick him." The court described Herbert's demeanor as "extremely comfortable" and "almost was poised in the interview."

Based on the "totality of the circumstances, . . . the [c]ourt [found] that Herbert knowingly, voluntarily, and intelligently waived his rights and agreed to speak to the detectives." It further found Herbert never exercised any of his constitutional rights. The court concluded

> that a reasonable and logical interpretation of Herbert's comment [that], "[i]f you . . . say you have the evidence, you say you have all the answers, then I guess only thing left for you to do I guess is to go to court and we'll figure it out from there. I guess I get a lawyer and then figure it out from there," was simply what Herbert was expecting to happen in the future.

The court similarly determined that when Herbert described getting a lawyer and going to court on several occasions, the reasonable inference is that he intended to describe his expectations for the future, not a present invocation of the right to counsel. In addition, the court determined that Herbert's statement, "I don't have anything else," is reasonably interpreted as him saying he did not have anything more to say about the robbery specifically, not that he wanted to terminate the interrogation altogether. The court explained that Herbert could instead have stated, "I'm finished. I want the interview to end." However, Herbert did not do so and thus did not actually intend for the interview to end. As evidence of his intention to continue the interview, the court noted that Herbert proceeded to answer all the of the detectives' questions without objection.

The court stated it was "convinced beyond a reasonable doubt that [Herbert] knowingly, voluntarily, and intelligently waived his rights under [Miranda] . . . and voluntarily answered all of the detectives' questions without ever invoking any of his constitutional rights." Accordingly, the court granted the State's motion to introduce portions of Herbert's statement at trial.

The State proffered Adam Durando as an expert in cellular telephone records, cellular mapping programs, and cell-site analysis. The court conducted a

N.J.R.E. 104 hearing on the admissibility of Durando's testimony. During the hearing, Durando testified that, as part of his job, he makes sure that all Sprint customers have cellular service when they attempt make a call. This requires a customer's phone to remain in constant contact with a cell tower, which reveals the general location of the customer's phone. Durando testified that there may be occasion when a cell phone does not connect to the nearest cell-site because a different tower might provide a better signal to the customer due to nearby buildings, terrain, and local topology. Durando explained, however, that Sprint takes into consideration the local terrain, topology of a tower location, and cell-site traffic when designing tower sites.

Durando further testified that he reviewed the cell phone numbers registered to Herbert and Charles and used repoll numbers to identify the relevant cell tower sites to map the calls at issue in this case. He explained that he reviewed the cell phone numbers with Map Info, a commercially accepted mapping tool used throughout the industry that graphically represents where Sprint's sites are located relative to the streets. Durando testified that although he could not determine the exact location of a cell phone during a call, he could confirm that a call was placed somewhere within the site's coverage area, which is usually around seven miles. Durando also testified that a "drive test" is sometimes performed to cure a

customer's complaint about poor service, but he was unable to conduct a drive test for this case because he did not have all the information necessary.

The court granted the State's motion to permit Durando to testify as an expert, determining that Durando was highly qualified and "ha[d] sufficient expertise" in the fields of cellular telephone records, cellular mapping program, and cell-site analysis. It noted that Durando had twenty-five years of experience and received forty hours of training annually.

The court found the State met its burden of proving that Durando's proffered testimony was "generally accepted among those in the profession." It pointed to case law specifically addressing the reliability and general acceptance of cell-site analysis to determine the general location of a cell phone. The court noted that the State sought to introduce evidence of defendants' general location based on the use of specific cell towers and sectors rather than to pinpoint the exact location of the cell phone user. It thus concluded that "[t]estimony concerning the location of cell towers, the sectors used for each call, and the general location" of cell phones when connected to each tower "[a]re the product of reliable principles and methods." Lastly, the court concluded that "[a]ny questions concerning the mapping data and the reliability of testimony" affect "the weight of his testimony," not its admissibility.

The trial commenced on June 6, 2017. We briefly recount the pertinent testimony, objections, and evidentiary rulings made by the trial court. We also discuss the accomplice liability instruction given by the court.

The State called Onyeagoro to testify about the content and background of text messages between Onyeagoro, Charles, and Herbert on the night of the robbery. The first text message was from Onyeagoro to Charles; it read: "Text me this n--ga Herbert['s] number[.]" Charles replied, "Ight[.]"

Onyeagoro testified that he texted Herbert to "[contact him] back [about] that ish we'd talked about its still in the office[.]" He explained that when he referred to the office, he meant "the safe that is in the office at [his] job." Onyeagoro explained that another text message to Herbert, which read: "All right. Nothing crazy. A quick grab and go[,]" meant "a quick in and out" robbery of the office where Onyeagoro worked. He testified that the text message referred to a planned robbery.

The State introduced text messages between Onyeagoro and Herbert's cell phones. Both defense counsel objected to the admission of the text messages, claiming lack of authentication based on the impossibility of knowing whether Herbert personally sent the messages even though they were sent to or from his cell phone. The court overruled the objection, finding that

Herbert's argument went to the weight of the evidence, not its admissibility. Defense counsel did not, however, object to the contents of the messages due to their reference to prior bad acts and resulting prejudicial impact.

Soon thereafter, Onyeagoro testified that he, Herbert, and Charles attended a party that night, and after the party, he drove the trio around and were "not particularly doing anything. [They] were just discussing locations or persons that [they could] rob." Charles suggested they rob the BP station on Route 22. Onyeagoro testified that at first he refused "because it was getting late but [Charles and Herbert] insisted because the profit of that previous night into the morning was low." This was appeared to be a reference to another robbery the three had committed.

Both defense attorneys objected and moved for a mistrial because Onyeagoro was implicating both defendants in other crimes. The court denied the motion for a mistrial but sustained the objection since the testimony implied that defendants committed other, uncharged crimes. It found that although Onyeagoro's statement began to implicate defendants of a different crime, his testimony could be interpreted in other ways and thus did not warrant a mistrial. The court struck Onyeagoro's statement and directed the jury to "disregard it and not to consider it as evidence in this case" but did not

provide further instruction to avoid shedding more light on the substance of the testimony. Defense counsel agreed.

According to Onyeagoro, during the robbery of the gas station, Charles had a gun and Herbert had a knife. Onyeagoro pulled up to a pump and asked for $20 worth of gas. Charles put the attendant in a choke hold and placed the gun at his head. Charles or Herbert shouted, "give us the f--king money, where is the f--king money at." Onyeagoro identified Charles and Herbert as the men in the surveillance video. Herbert told Onyeagoro to leave; he pulled away from the gas station without his gas cap. Onyeagoro was stopped by police shortly thereafter.

During cross-examination, defendants attacked Onyeagoro's credibility by demonstrating that in several instances, his testimony on direct materially varied from what he told the police during the investigation. Defendants attempted to show that Onyeagoro implicated Charles and Herbert in order to obtain a favorable plea agreement that reduced his exposure from first-degree to second-degree robbery and resulted in a downgraded three-year prison term.

The State also presented Durando's expert cell-site analysis testimony. Durando testified that he used the defendants' phone numbers and cell-site data to map out the location of the defendants' phones at the time of the robbery.

Further, Durando testified that defendants' phones were within seven miles of the cell tower they connected to.

The State also presented New Jersey State Police Detective Sergeant First Class Brett Bloom, who is assigned to the Firearms Investigation Unit as a firearms expert. The gun in evidence was a BB gun pistol. He testified without objection that neither Chares nor Herbert had ever been issued a permit to carry a handgun, a permit to purchase a handgun, a firearm identification card, or a permit for an assault weapon in the State of New Jersey. He further testified that that under New Jersey law, a BB gun is considered a firearm and is subject to the same permitting procedures.

At the close of the State's case, defendants moved for judgment of acquittal on the unlawful possession of a firearm count based on the lack of evidence that the BB gun was operable. The court granted the motion, noting "the State has not called an expert in regard to operability." It explained that N.J.S.A. 2C:39-5(b) requires the State to prove that the firearm at issue was "originally designed or manufactured to fire or eject any solid projectile[ or] ball[.]" Because the State did not call an expert regarding operability, the court found the "jury would have to speculate" about whether the BB gun "was originally designed or manufactured to eject" a projectile ball.

On the other hand, the court held that a BB gun is a firearm under N.J.S.A. 2C:39-4(a) because operability is not an element of possession of a firearm for an unlawful purpose. Neither defense counsel argued for judgment of acquittal of the aggravated assault by pointing a firearm charge.

During its summation, the State discussed Durando's expert testimony. The State argued that, according to Durando's testimony, defendants were in the general area of the crime and that they were together.

The court instructed the jury on accomplice liability with respect to the robbery count and lesser-included theft charge but not as to the aggravated assault by pointing a firearm charge. Neither defense counsel objected.

On June 29, 2017, the jury acquitted Herbert and Charles of robbery but found both guilty of the lesser-included offenses of fourth-degree aggravated assault by pointing a firearm and disorderly persons theft; second-degree conspiracy to commit robbery; and second-degree possession of a weapon for an unlawful purpose.

At sentencing, the State argued for consecutive terms. Applying the Yarbough[4] factors, the court declined to impose any consecutive terms.

---

[4] State v. Yarbough, 100 N.J. 627 (1985).

Defense counsel argued that Herbert should be sentenced in the third-degree range on the two second-degree crimes, contending the mitigating factors substantially outweighed the limited aggravating factors. Counsel noted that Onyeagoro was sentenced to a downgraded three-year term on the second-degree conspiracy count that he pleaded guilty to.

The court found aggravating factor nine (need for deterrence), N.J.S.A. 2C:44-1(a)(9), outweighed mitigating factor seven ("no history of prior delinquency or criminal activity"), N.J.S.A. 2C:44-1(b)(7). The court rejected mitigating factor six (defendant has or will compensate the victim), N.J.S.A. 2C:44-1(b)(6), because the victim returned to the country from which he immigrated from and has not been compensated. It rejected mitigating factor eight (defendant's conduct was the result of circumstances unlikely to recur), N.J.S.A. 2C:44-1(b)(8), finding Herbert was equally culpable of the crimes despite defendant's assertion that Onyeagoro was the true mastermind. The court rejected mitigating factor nine (the character and attitude of the defendant indicate he is unlikely to reoffend), N.J.S.A. 2C:44-1(b)(9), because there was insufficient evidence to make that finding.

Following merger of the aggravated assault by pointing a firearm count into count four, Herbert was sentenced to an aggregate seven-year term. More

14

specifically, Herbert received a six-month term for the disorderly persons theft; a seven-year term, subject to the mandatory periods of parole ineligibility and parole supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the conspiracy to commit robbery; and a seven-year term, subject to a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), for the possession of a weapon for an unlawful purpose. All terms run concurrently. This appeal followed.

Herbert raises the following points for our consideration.

POINT I

THE TRIAL COURT ERRED IN ADMITTING HERBERT'S STATEMENT TO POLICE BECAUSE HE INVOKED HIS RIGHTS TO SILENCE AND TO COUNSEL.

POINT II

DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO THE IMPROPER ADMISSION OF TESTIMONY ABOUT OTHER UNCHARGED ROBBERIES.

POINT III

THE TRIAL COURT ERRED IN ADMITTING ENTIRELY IRRELEVANT EXPERT TESTIMONY AND MAPS ABOUT CELL SITE DATA, AND THE PROSECUTOR COMMITTED MISCONDUCT BY MISCHARACTERIZING THE TESTIMONY.

A. Introduction.

B. The Expert Testimony And Maps Were Inadmissible Because They Were Irrelevant But Highly Prejudicial.

C. The State's Use Of The Expert Testimony And Maps Was Inappropriate And Prejudicial.

POINT IV

THE FAILURE TO INSTRUCT THE JURY ON ACCOMPLICE LIABILITY FOR THE AGGRAVATED ASSAULT CHARGE REQUIRES ITS REVERSAL.

POINT V

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.

POINT VI

THE TRIAL COURT ERRED BY REFUSING TO DISMISS THE COUNTS CHARGING POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE AND AGGRAVATED ASSAULT BY POINTING A FIREARM.  (Not Raised Below).

I.

Herbert contends that the trial court erred in admitting his statement to police because he repeatedly invoked his right to remain silent and to counsel, but police continued interrogating him.  He argues that although he denied any involvement in the gas station robbery, "portions of his statement undermined

16

his credibility and thus gave the jury an impermissible reason to credit Onyeagoro's trial testimony."[5] We disagree.

We are guided by well-established legal principles. When reviewing "a trial court's admission of police-obtained statements," we "engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Maltese, 222 N.J. 525, 543 (2015) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). "We do not independently assess evidence as if we are the trial court." Ibid. (citing Hreha, 217 N.J. at 382). Rather, we "typically defer to the trial court's credibility and factual findings." Hreha, 217 N.J. at 382. Such "findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Tillery, 238 N.J. 293, 314 (2019) (quoting State v. A.M., 237 N.J. 384, 395 (2019)). "However, we owe no deference to conclusions of law made by lower courts in suppression decisions, which we instead review de novo." State v. Boone, 232 N.J. 417, 426 (2017) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

---

[5] Defendant argues that a statement taken from the interview, in which he denied that a phone number was his, was used at trial to undermine his credibility.

Evidence obtained in violation of <u>Miranda</u> must be suppressed at trial. <u>State v. Hartley</u>, 103 N.J. 252, 262 (1986). Herbert does not argue that the <u>Miranda</u> warnings he received were somehow defective. Nor does he argue that he did not initially waive those rights "voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444; <u>Hartley</u>, 103 N.J. at 261. Instead, he argues he exercised his right to remain silent.

Whether a defendant invoked the right to remain silent is determined under the totality of the circumstances. <u>Maltese</u>, 222 N.J. at 545. An invocation of the right to remain silent must be "scrupulously honored." <u>Hartley,</u> 103 N.J. at 255-56 (citing <u>Michigan v. Mosley</u>, 423 U.S. 96 (1975)). If the invocation is ambiguous, the officer may only ask clarifying questions about whether he or she meant to invoke the right to remain silent. <u>State v. Johnson</u>, 120 N.J. 263, 283 (1990). An ambiguous invocation of the right to remain silent must be clarified before authorities can proceed to question a suspect. <u>State v. S.S.</u>, 229 N.J. 360, 384, 386 (2017).

Where the totality of the circumstances demonstrates that the defendant exercised his right to remain silent or to counsel, whether ambiguously or unambiguously, the <u>Hartley</u> bright-line rule requires <u>Miranda</u> warnings to be readministered. <u>Hartley</u>, 103 N.J. at 267.

Applying these principles, we discern no error. The record fully supports the court's findings that Herbert "knowingly, voluntarily, and intelligently waived his rights and agreed to speak to the detectives" and did not subsequently exercise his right to remain silent or to speak to an attorney or to have counsel present. The record further supports the trial court's findings that Herbert's comments about getting a lawyer and going to court related to "what Herbert was expecting to happen in the future," "not an invocation of the right to an attorney."

The record likewise supports the trial court's finding that a reasonable interpretation of Herbert's comment, "No. I don't have anything else[,]" merely expressed that he did not have anything more to say about the robbery, not that he wanted to terminate the interview entirely. The record further supports its finding that Herbert did not say anything else that "could [be] reasonably interpret[ed] as wanting to terminate the interview."

The court found that Herbert, who "remained calm, cool, and collected throughout the interview" and appeared to be "educated, articulate, and intelligent," could easily have said that he wanted the interview to end but did not do so. He also never told the detectives that he wanted to speak to an attorney or to have one present. Instead, "throughout the interview . . .

defendant . . . answered all of the detectives' questions, disagreed with their accusation, and more than held his own."  Moreover, "[a]t no time did he appear reluctant to answer their questions or to be uncomfortable.  In fact, Herbert appeared . . . to be quite relaxed and at eas[e], comfortable and confident during the entire interview and was rather talkative at times."

Considering the totality of the circumstances, the trial court properly determined that Herbert's statement was admissible in evidence.  Moreover, the ultimate use of Herbert's denial that a certain phone number was his to undermine his credibility, "was harmless [error] beyond a reasonable doubt." Tillery, 238 N.J. at 319.  This evidence did "little to advance the State's otherwise comprehensive case against defendant."  Id. at 322.

## II.

We next address Herbert's argument that the trial court erred by admitting Onyeagoro's testimony and text messages from December 19 about other uncharged robberies without a limiting instruction.  We agree.

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."  N.J.R.E. 404(b)(1).  Accordingly, "[e]vidence regarding other specific acts may not be used to

prove the commission of a particular act on a particular occasion, unless they establish habit or routine practice under N.J.R.E. 406." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1(b) on N.J.R.E. 404 (2020).

Evidence of other crimes and bad acts "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2). Thus, evidence of a prior bad act may be admissible to establish a "common scheme or plan, a signature crime, motive, and most frequently, to impeach the accused who takes the witness stand, but only through a conviction." State v. Weeks, 107 N.J. 396, 406-07 (1987).

Rule 404(b) is based on "the inordinate prejudice to the defendant inherent in other-crimes evidence." State v. Hernandez, 334 N.J. Super. 264, 269 (App. Div. 2000), aff'd as mod., 170 N.J. 106 (2001). "The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is 'a "bad person" in general.'" State v. Cofield, 127 N.J. 328, 336 (1992) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)).

Even where other bad acts are used for an admissible purpose, trial courts should "take pains to instruct juries carefully and comprehensively, with

ample reference to the specific evidence and issues in a case, on the limited relevance of other [bad act] evidence." State v. Stevens, 115 N.J. 289, 309 (1989). The trial court must provide a limiting instruction to the jury "both when the evidence is first presented and again as part of the final jury charge." State v. Garrison, 228 N.J. 182, 200 (2017) (quoting State v. Rose, 206 N.J. 141, 161 (2011)).

Before a court determines whether a prior bad act is admissible for a particular purpose, it should determine first whether the evidence relates to a prior bad act or whether it is intrinsic to the charged offense. State v. Brockington, 439 N.J. Super. 311, 325 (App. Div. 2015) (quoting Rose, 206 N.J. at 179). Evidence that is intrinsic to a crime, while needing to satisfy the rules relating to relevancy and undue prejudice, "is exempt from the strictures of Rule 404(b)." Rose, 206 N.J. at 177-78.

Intrinsic evidence is limited to two categories: (1) evidence that "directly proves" the charged offense; and (2) evidence that, when "performed contemporaneously with the charged crime," facilitates "the commission of the charged crime." Brockington, 439 N.J. Super. at 327-28 (quoting Rose, 2016 N.J. at 180). As to the second category of intrinsic evidence, the temporal proximity between the uncharged bad act and the indicted crime must be

contemporaneous, not simply "close in time[,]" and the link between the same must be "meaningful." Brockington, 439 N.J. Super. at 338.

Because Herbert did not raise issue to the testimony or use of the text messages under Rule 404(b), he must show that the court's admission of the evidence was "plain error clearly capable of producing an unjust result." State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)); R. 2:10-2.

Herbert asserts that the court's admission of the text messages that implicated defendant in a "quick grab and go" and Onyeagoro's explanation constituted plain error as a prior uncharged crime in violation of N.J.R.E. 404(b). Herbert further asserts that even if the text messages were admissible, the trial court was required to provide a limiting instruction to the jury.

The State asserts the text messages were intrinsic evidence not within the scope of Rule 404(b) because they directly prove the commission of the conspiracy to commit robbery and the eventual robbery of the gas station for which defendant was on trial. We disagree.

The admission of the text messages is precisely the situation where a limiting instruction is necessary to ensure that the jury does not misapply this highly prejudicial evidence. To be sure, the text message conversation, which

shows an agreement to steal from the safe at Onyeagoro's workplace, is strong evidence of a conspiracy to commit a theft at that location. Herbert and Onyeagoro discussed a quick "grab and go" theft at Onyeagoro's workplace after Onyeagoro got off work. However, neither Herbert nor Onyeagoro mentioned the use of force or use of threats to accomplish the theft, which are essential elements to a conspiracy to commit robbery. See N.J.S.A. 2C:15-1 and N.J.S.A. 2C:5-2.

More fundamentally, the text messages did not discuss plans to rob the gas station. They are extrinsic to Herbert's charges. Accordingly, the trial court was required to conduct a Rule 404(b) analysis but did not do so. The court should have analyzed whether the text messages could be used to show a common plan or motive to prove a robbery, unlawful possession of a firearm, or possession of a firearm for unlawful purposes. In any event, even if admissible under Rule 404(b), the trial court would have needed to provide the jury with a limiting instruction. See Stevens, 115 N.J. at 309 (explaining that trial courts should "take pains to instruct juries carefully and comprehensively, with ample reference to the specific evidence and issues in the case, on the limited relevance of other[ bad act] evidence").

First, evidence relating to an agreement to make a quick "grab and go" did not "directly prove" the crime of robbery, which has more elements than the crime contemplated in the text messages. The text messages also did not facilitate the commission of the gas station robbery. While the jury eventually found defendant not guilty of robbery, the text message evidence may well have been used in the jury's deliberation in considering whether to convict Herbert of the lesser-included offenses "because he is a bad person in general." Cofield, 127 N.J. at 336 (quotations omitted).

In addition, the text messages did not directly prove or facilitate the commission of the crimes of unlawful possession of weapons or possession of weapons for unlawful purposes. N.J.S.A. 2C:39-4(a)(1) and N.J.S.A. 2C:39-5(b). While the trial court eventually dismissed the unlawful possession of a weapon charge, the jury found defendant guilty of possession of a weapon for an unlawful purpose. The jury may well have impermissibly used the highly prejudicial text messages as evidence that Herbert was likely to commit this crime.

Our Supreme Court has determined that a Rule 404(b) violation necessitates reversal if the limiting instruction is inadequate. See Cofield, 127 N.J. at 341-42 (ordering a reversal where the limiting instruction "did not

narrowly focus the jury's attention on the <u>specific</u> use of other[ bad act] evidence, but instead made reference only to the generalities of [Rule 404(b)]."). <u>But see</u> <u>Stevens</u>, 115 N.J. at 309 (concluding reversal is not necessary where the trial court twice cautioned the jury against using 404(b) evidence as propensity evidence). Here, the trial court's failure to give a limiting instruction was "plain error clearly capable of producing an unjust result." <u>Bunch</u>, 180 N.J. at 541 (quoting <u>Afanador</u>, 151 N.J. at 54). Accordingly, we reverse Herbert's convictions for aggravated assault by pointing a firearm, theft, and possession of a firearm for an unlawful purpose.

In addition, we also reverse Herbert's conviction for conspiracy to commit robbery. The text messages were not admissible to prove the conspiracy to commit the robbery at the gas station. Combined with the possible prejudice implicated from Onyeagoro's statement about the low profits the night before, which was stricken but not cured, we conclude that the admission of the text messages also constituted plain error infecting the conviction for conspiracy.

On remand, Herbert shall be retried after conducting a Rule 404(b) analysis. If deemed admissible as to the charges other than conspiracy to commit robbery, an appropriate limiting instruction shall be given to the jury.

26

Herbert argues that the trial court erred in admitting expert testimony and maps about cell-site analysis that was not sufficiently reliable and irrelevant, and that the prosecutor engaged in misconduct by mischaracterizing that testimony.

A.

We first address whether the expert testimony was sufficiently reliable to be admissible. A trial court's evidentiary determination that a witness is qualified to present expert testimony under N.J.R.E. 702 is reviewed for abuse of discretion "and will only be reversed for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)). N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

The party offering the expert testimony bears the burden of proof. State v. Harvey, 151 N.J. 117, 167 (1997) (citing Windmere, Inc. v. Int'l Ins. Co.,

105 N.J. 373, 378 (1987)).  Our Supreme Court has set out a three-part test for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Jenewicz, 193 N.J. at 454.]

Herbert essentially contests only the second prong under Jenewicz, that the cell-site tower analysis was not sufficiently reliable.  He asserts that Durando's testimony—that Herbert's cell phone was within a particular area around the time of the crime—required a "drive test" because, as Durando testified, cell-site information can only give a rough estimation of Herbert's location.  The State relies on Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), for the proposition that it satisfied the second prong because cell-site tests have gained "general acceptance in the particular field."

The test for admissibility in criminal cases is "whether the scientific community generally accepts the evidence."  Harvey, 151 N.J. at 170 (citing State v. Spann, 130 N.J. 484, 509 (1993); Windmere, 105 N.J. at 386).  "General acceptance, however, does not require complete agreement over the accuracy of the test or the exclusion of the possibility of error."  Id. at 171.  To

establish general acceptance, "the party proffering the evidence need not show infallibility of the technique nor unanimity of its acceptance in the scientific community." State v. Cassidy, 235 N.J. 482, 492 (2018). Here, the State must prove that the cell-site analysis methodology "and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable." Harvey, 151 N.J. at 171.

"Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question we review de novo." State v. J.L.G., 234 N.J. 265, 301 (2018). "When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." Harvey, 151 N.J. at 167.

The trial court relied on United States v. Jones, 918 F. Supp. 2d 1 (D.D.C. 2013), which recognized the reliability of cell-site analysis to determine the relative location of a cell phone at a particular time. Notably, defendant does not assert that there is controlling case law that finds cell-site analysis unreliable or otherwise inadmissible. Instead, defendant argues simply that cell-site data is not the most helpful information.

29

Having carefully reviewed the record in light of the applicable precedents, we affirm the trial court's conclusion that historical cell-site data analysis is generally accepted in the scientific community and sufficiently reliable to be admitted into evidence to show the general location of a cell phone at a particular time.  The trial court properly found that cell-site analysis is a sufficiently reliable method to determine the approximate location of a cell phone at the time an incident occurred.

There is no published opinion in this State squarely addressing the admissibility of historical cell-site data analysis in a criminal matter, but a number of out-of-state and federal precedents, however, are instructive.

Federal courts have been receptive to expert testimony regarding historical cell-site data analysis.  "District courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so."  United States v. Hill, 818 F.3d 289, 297 (7th Cir. 2016); see United States v. Weathers, 169 F.3d 336, 339 (6th Cir. 1999) (discussing admission of expert testimony on historical cell-site data analysis); United States v. Reynolds, 626 Fed. App'x 610, 618 (6th Cir. 2015)[6] (allowing historical cell

---

[6] We cite these cases for sake of completeness, noting that although the cases are reported in the Federal Appendix, they are not published and, therefore, do not constitute precedent.  R. 1:36-3.  We note, however, that Rule 32.1 of the

site data analysis to show where parties other than defendant were not); <u>United States v. Schaffer</u>, 439 F. App'x 344, 347 (5th Cir. 2011) (concluding that the field of historical cell-site data analysis "is neither untested nor unestablished"); <u>Jones</u>, 918 F. Supp. 2d at 5 (finding "the use of cell phone location records to determine the general location of a cell phone" to be both widely accepted and "based on reliable methodology"); <u>United States v. Evans</u>, 892 F. Supp. 2d 949, 955-56 (N.D. Ill. 2012) (finding "granulization theory" to be unreliable science, but still finding other historical cell site data analysis methods have been adequately tested).

So too have the courts of other States.  <u>See</u> <u>State v. Johnson</u>, 797 S.E.2d 557, 563 (W.Va. 2017); <u>Pullin v. State</u>, 534 S.E.2d 69, 71 (Ga. 2000); <u>Wilson v. State</u>, 195 S.W.3d 193, 200-02 (Tex. Crim. App. 2006) (allowing a Sprint employee to testify as an expert on historical cell site data analysis).

In <u>Hill</u>, the Seventh Circuit found that "[h]istorical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one.  It shows the cell sites with which the person's cell phone connected, and the science is well understood."  818 F.3d at 298 (citing <u>Evans</u>, 892 F. Supp. 2d at 956).

Federal Rules of Appellate Procedure permits citation to opinions reported in the Federal Appendix.

An expert may rely on any "sufficiently reliable" test; the test need not be the most accurate. Ibid. Because cell-site data is sufficiently reliable and may indicate the general whereabouts of a person's cell phone, the trial court properly admitted Durando's testimony.

## B.

We next address whether the cell-site analysis was irrelevant. "'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. An explanation of how cell towers work and the general location of Herbert's cell phone on the night of the incident would be helpful to the jury in understanding the State's claims about the movements and whereabouts of Herbert and his co-conspirators. The cell-site analysis would allow the jury to narrow the possible location of Herbert's cell phone during the course of the conspiracy. Accordingly, it was relevant.

## C.

Defendant further contends the prosecutor committed misconduct by mischaracterizing the cell-site analysis testimony and evidence during summation. We disagree.

"[A] prosecutor is afforded considerable leeway to make forceful arguments in summation." State v. Bradshaw, 195 N.J. 493, 510 (2008) (citing Bender v. Adelson, 187 N.J. 411, 431 (2006)). "Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995)). "Nevertheless, a prosecutor's summation 'is limited to commenting upon the evidence and reasonable inferences to be drawn therefrom.'" State v. Feaster, 156 N.J. 1, 58-59 (1998) (quoting State v. Johnson, 120 N.J. 262, 296 (1990)). A prosecutor "should [neither] make inaccurate legal or factual assertions during a trial," Bradshaw, 195 N.J. at 510 (quoting Frost, 158 N.J. at 85), nor make "references to matters extraneous to the evidence," State v. Jackson, 211 N.J. 394, 408 (2012). Mischaracterizing evidence is similarly improper. See Frost, 158 N.J. at 85 (concluding "the prosecutor's comments were not only inaccurate, they were misleading as well").

That said, prosecutorial "misconduct does not warrant reversal unless it is 'so egregious that it deprived the defendant of a fair trial.'" Jackson, 211 N.J. at 409 (quoting Frost, 158 N.J. at 83). "Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so

infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" Ibid. (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)).

During summation, the prosecutor stated, in relevant part:

> It's been clear what it is and what it is not. This is not GPS location data. This is not going to tell you the cross street somebody is sitting at, the house they're in. It is a tool that's twofold. Those twofold tools are for the first purpose being general area. Where are these people -- where is this phone generally located.
>
> . . . .
>
> Between the hours of then 10 p.m. and 10:49 p.m. both Gregory Herbert and Kadeem Charles' cell phones are pinging off the towers . . . right in Irvington. We know where their cell phones are located and the State submits to you where these two men are located at 10:50, they're together.
>
> . . . .
>
> Now, between 2:34 and 2:37 a.m. we have cell phones hitting down in Hillside.

These statements were, for the most part, well within the wide latitude afforded a prosecutor during his summation. See State v. DiFrisco, 137 N.J. 434, 474 (1994). The statement that the cell-site data could not give a precise GPS-like location was accurate. The statement that we knew the cell phone

was first in Irvington and then in Hillside is likewise accurate according to Durando's testimony. But the statement that the defendants were together because their cell phones connected to the same towers for hours on the night of the crime went beyond a natural inference drawn from the evidence. At most, one could reasonably infer defendants were in the same vicinity during the period in question.

With that singular exception, we hold that the prosecutor did not unfairly or inaccurately characterize the expert's testimony, much less engage in any misconduct that deprived defendant of a fair trial. On retrial, the prosecutor shall not argue that the cell-site analysis demonstrated that defendants were together.

## IV.

We next address Herbert's argument that the trial court erred by failing to instruct the jury on accomplice liability regarding the aggravated assault by pointing a firearm charge. We agree.

"Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379 (1988). "A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations. Thus, the

court must explain the controlling legal principles and the questions the jury is to decide." State v. Martin, 119 N.J. 2, 15 (1990). "Erroneous jury instructions on matters material to a jury's deliberations are ordinarily presumed to be reversible error." State v. Jackmon, 305 N.J. Super. 274, 277-78 (App. Div. 1997).

Where defense counsel does not object to a jury instruction at trial, the reviewing court will review it for plain error. R. 2:10-2. An erroneous jury instruction is plain error where the "possibility of injustice is 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Hogan, 297 N.J. Super. 7, 21 (App. Div. 1997) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Importantly, a trial court's failure to instruct the jury on accomplice liability with respect to a lesser-included offense is plain error where "reasonable persons could differ in their perceptions concerning [the defendant's] exact role and level of participation in the criminal events." State v. Harrington, 310 N.J. Super. 272, 278-80 (App. Div. 1998). See also State v. Walton, 368 N.J. Super. 298, 309 (App. Div. 2004) (finding reversible error where the trial court instructed the jury on accomplice liability separate from the lesser-included offense). "The trial court must also 'make specific

reference to [lesser-included] offenses in the context of its charge on accomplice liability.'" Walton, 368 N.J. Super. at 307 (quoting Harrington, 310 N.J. Super. at 278). A "trial court's failure to refer to accomplice liability while giving the lesser included charge [is] reversible error." Id. at 307 (citing Harrington, 310 N.J. Super. at 279).

In State v. Schmidt, the defendant was indicted for conspiracy to distribute narcotics and possession of narcotics; however, the conspiracy to distribute narcotics charge involved dates and parties different from the substantive possession charge. 110 N.J. 258, 265-66 n.1 (1988). The trial court failed to instruct the jury that "it could find the defendant guilty of the possession counts on the basis of vicarious liability as an accomplice or as a conspirator." Id. at 265. The Court held that "[s]ince the jury charge failed to instruct the jury on the vicarious liability of a conspirator as the basis for guilt, the constructive possession counts [could not] could not be sustained on that basis." Id. at 265-66, 275-76.

The State concedes that the trial court failed to instruct the jury on accomplice liability with respect to the aggravated assault by pointing a firearm charge but contends that, viewing the jury instructions in their entirety, the failure to instruct as to accomplice liability did not lead to an unjust result.

The State asserts that the same verdict would have resulted from a correct jury instruction. The State also contends that Schmidt is inapposite because the jury heard evidence relating to the defendant's charge of conspiracy and could have used that theory as a basis to convict defendant of aggravated assault.

The trial judge did not instruct the jury that Herbert could be vicariously liable for the assault charge from his participation in a conspiracy to commit a robbery or through accomplice liability. Without these instructions, the jury had no basis to find Herbert guilty of aggravated assault by pointing a firearm since there was no testimony or evidence presented that Herbert possessed the BB gun. Therefore, the jury would have to rely on either a theory of conspiracy or accomplice liability to convict Herbert of the aggravated assault by pointing a firearm. The failure to provide an accomplice liability charge on the lesser-included aggravated assault offense constituted plain error. Accordingly, we reverse Herbert's conviction for aggravated assault and remand for retrial.

V.

Herbert further argues that the trial court erred by not granting a judgment of acquittal on the charges of possession of a firearm for an unlawful purpose and aggravated assault by pointing a firearm. We disagree.

A defendant may move for judgment of acquittal under Rule 3:18-1 if the State has not proven each of the elements of a crime. A motion for judgment of acquittal may be granted if, viewing all the evidence in the light most favorable to the State, "as well as all of the favorable inferences which could reasonably be drawn therefrom," no "reasonable jury could find guilt of the charge beyond a reasonable doubt." State v. Reyes, 50 N.J. 454, 458-59 (1967) (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961)). Such instances of guilt may "be based on circumstantial evidence." State v. Franklin, 52 N.J. 386, 406 (1968) (citing Fiorello, 36 N.J. at 86).

The Reyes standard applies to appellate review of the sufficiency of evidence. State v. Kittrell, 145 N.J. 112, 130 (1996). "In deciding whether the trial court was correct in denying [a Reyes] motion, we . . . take into account only the evidence on the State's case, unaided by what defendant later developed at trial." State v. Lemken, 136 N.J. Super. 310, 314 (App. Div. 1974).

Herbert moved under Reyes to dismiss the charges of unlawful possession and possession for unlawful purpose. The trial court dismissed the unlawful possession of a weapon charge but not the possession of a weapon for an unlawful purposes charge.

A-5556-17T4

Defense counsel did not move to dismiss the aggravated assault by pointing a firearm charge. On the contrary, defense counsel moved to include the aggravated assault charge as a lesser-included offense. Accordingly, as to aggravated assault charge, we review for plain error. R. 2:10-2.

A person is guilty of possession of a weapon for an unlawful purpose if they possess a firearm with the purpose to use it unlawfully. N.J.S.A. 2C:39-4(a)(1). A firearm is defined under the statute as:

> any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.
>
> [N.J.S.A. 2C: 39-1(f).]

The same definition of firearm applies to aggravated assault by pointing a firearm charge, "whether or not the actor believes it to be loaded." N.J.S.A. 2C:12-1(b)(4); N.J.S.A. 2C:39-1(f).

A BB gun is a firearm within the definition of N.J.S.A. 2C: 39-1(f). State v. Mieles, 199 N.J. Super. 29, 37-38 (App. Div. 1985). An inoperable BB gun also qualifies as a firearm under the statute. State v. Austin, 335 N.J.

Super. 486, 490 (App. Div. 2000). A "fake or toy gun" does not. State v. Gantt, 101 N.J. 573, 584 (1986).

As to possession of a firearm for an unlawful purpose, the State need not prove the operability of a firearm at the time of the offense; it need only prove the firearm was originally designed as operable. Id. at 584-85. The trial court need only be satisfied "that the device was originally designed to deliver a potentially-lethal projectile and hence 'real.'" Id. at 589. To that end, "an object's authentic design may be inferred from appearance or based on lay testimony, but in no case is it dependent upon empirical examination of the weapon." Id. at 589-90. Indeed, the Gantt Court found sufficient evidence existed to support the finding that the weapon involved was a "firearm" even though the weapon used in the robbery was never recovered. Id. at 591.

Here, as in Gantt, there was no evidence or testimony to contradict the conclusion that the BB gun was real. See ibid. Herbert offered no evidence that the weapon was a toy or fake. Accordingly, the trial court was "justified in concluding that the [BB gun] was real and therefore a firearm within the meaning of N.J.S.A. 2C:39-1(f)." Ibid. Therefore, the trial court did not err by denying a judgment of acquittal on that count.

The same analysis applies to the aggravated assault by pointing charge. An instrument may be regarded as a firearm for purposes of aggravated assault by pointing a firearm without showing that the instrument was operable at the time of the offense. Mieles, 199 N.J. Super. at 38-39. Further, "both loaded and unloaded weapons should be considered to be firearms in prosecutions for aggravated assault under N.J.S.A. 2C:12-1(b)(4)." Id. at 38 (citing State v. Bill, 194 N.J. Super. 192, 198 (App. Div. 1984)).

On the other hand, the State must prove the operability of a firearm on the unlawful possession charge. See N.J.S.A. 2C:39-5(b). Indeed, as to that charge, the trial judge recognized that the jury would need to speculate as to the operability of the BB gun without expert testimony. No such evidence was presented. The trial court properly dismissed that count.

## VI.

Because we reverse Herbert's convictions and remand for retrial, we do not reach his excessive sentencing argument.

Reversed and remanded for further proceedings and retrial consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5556-17T4