708 A.2d 731

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. GREGORY HARRINGTON, DEFENDANT– APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 11, 1998—Decided March 27, 1998.

Before Judges BAIME, BRAITHWAITE and BILDER.

*James K. Smith, Jr.*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Smith*, of counsel and on the brief).

*Lisa Sarnoff Gochman*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Gochman*, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Following a lengthy jury trial, defendant was found guilty of purposeful or knowing murder (*N.J.S.A.* 2C:11–3a(1) and (2)), felony murder (*N.J.S.A.* 2C:11–3a(3)), first degree robbery

(*N.J.S.A.* 2C:15–1), third degree possession of a knife for an unlawful purpose (*N.J.S.A.* 2C:39–4d), third degree possession of a weapon under circumstances not manifestly appropriate for lawful use (*N.J.S.A.* 2C:39–5d), second degree aggravated assault (*N.J.S.A.* 2C:12–1b(1)), and third degree aggravated assault (*N.J.S.A.* 2C:12–1b(2)). On the conviction for purposeful or knowing murder, the trial court sentenced defendant to life imprisonment with a thirty year parole disqualifier. A consecutive sentence of twenty years with a ten year parole disqualifier was imposed on the conviction for first degree robbery. Defendant was sentenced to a consecutive term of ten years with a five year parole disqualifier on the conviction for second degree aggravated assault. The remaining convictions were merged. Defendant contends on appeal that: (1) the trial court committed plain error in its charge on accomplice liability, (2) trial counsel was constitutionally ineffective, (3) the prosecutor exceeded the bounds of fair comment in his opening statement, and (4) the sentences were manifestly excessive. We are constrained to reverse.

## I.

In the early evening hours of January 12, 1994, Richard Harry was walking home from work when he was accosted by four men and stabbed in the chest. Approximately one-half hour later, Rudolfo Llorente was approached by the same men and was stabbed and robbed. Harry recovered from his near-fatal wound. Llorente did not.

The prosecution's evidence against defendant consisted primarily of the testimony of his alleged confederates—Anthony Ramirez, Greg Hickman and Jimmy Torres. These individuals were each granted immunity and testified that it was defendant who stabbed Harry and Llorente. They also recounted that defendant attempted to rob another person, Alberto Garcia Espado, some time between the two stabbings. Espado testified at trial and confirmed that defendant had attempted to rob him. However, Harry identified Hickman as the individual who had stabbed him.

We add that the testimony of Ramirez, Hickman and Torres diverged wildly on many key points, and each gave the police markedly inconsistent statements concerning the extent of their participation in the crime.

Torres, for example, testified that he did not see defendant stab Harry. He claimed, instead, that he heard defendant ask Harry for a quarter. Shortly thereafter, defendant exclaimed he had "just stabbed" the victim and displayed a six or seven inch steak knife to his confederates. Torres further claimed that he and Hickman did not participate in the robbery and killing of Llorente. Torres stated that he and Hickman merely watched impassively as defendant stabbed the victim and Ramirez rifled through the victim's pockets. Torres admitted that Hickman then approached Llorente's lifeless body and picked him up and shook him while defendant cleaned his bloody knife in the snow. Although Hickman's testimony deviated from that of Torres in many details, he agreed that defendant and Ramirez were the principal culprits in the robbery and murder of Llorente.

Ramirez testified that defendant had shown him a steak knife while the two men were walking toward the downtown area to meet Hickman and Torres. According to Ramirez, he did not see defendant stab Harry, having stopped to urinate in a nearby alley. Ramirez claimed that when he caught up to the other three men, Hickman told him that defendant had stabbed the victim. In his trial testimony, Ramirez asserted that defendant said, "he wanted to stick up somebody," as the four men noticed Llorente crossing the street. Ramirez testified that defendant walked up to Llorente and "push[ed] him [in] the chest area." Llorente immediately fell to the ground. Defendant, Torres and Ramirez then fled the scene. Ramirez testified that Hickman remained behind. Later, Hickman met the other three men and, while washing the blood from his hands with snow, exclaimed that he had "got[ten] paid." Ramirez claimed that, while in prison after their arrest, defendant had ordered him to falsely implicate Hickman in the killing of Llorente.

Lisa Cortes was defendant's sole witness. She testified that Hickman attempted to rob her approximately six months after the murder of Llorente. Cortes recalled Hickman threatening to "do [her] the way him and his friends did the guy on Morgan Street." In her statement to the police, Cortes' recollection was somewhat different. Cortes told the police that Hickman ordered her to "give it up" because he had "killed someone before." Cortes also claimed that Hickman's friends had attempted to prevent her from testifying about Hickman's statement.

It is against this factual backdrop that we consider defendant's arguments.

## II.

Initially, we are obliged to reverse defendant's convictions for purposeful or knowing murder, first degree robbery and second degree aggravated assault. These convictions were tainted by the trial court's faulty instructions on accomplice liability.

Defendant neither submitted a request to charge nor interposed a timely objection. We have consistently held, however, that the failure of a trial court to properly charge a jury is grounds for reversal, even though defense counsel failed to object at the appropriate time. *State v. Weeks* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987). "So critical is the need for accuracy that erroneous instructions on material points are presumed to be reversible error." *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990); *see State v. Weeks,* 107 *N.J.* at 410, 526 *A.*2d 1077; *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986). We have recently reiterated the point that " '[c]lear and correct jury charges are essential for a fair trial.' " *State v. Cook,* 300 *N.J.Super.* 476, 488, 693 *A.*2d 483 (App.Div.1996) (quoting *State v. Brown,* 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994)). The Supreme Court has said that incorrect instructions of law "are poor candidates for rehabilitation under the harmless error theory." *State v. Weeks,* 107 *N.J.* at 410, 526 *A.*2d 1077 (citing *State v. Warren,* 104 *N.J.* 571, 518 *A.*2d 218 (1986)).

The accomplice charge in this case suffered from the same infirmities as those noted in *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 632 *A.*2d 277 (App.Div.1993). More specifically, the instructions did not inform the jury that even if it concluded that the principal committed purposeful or knowing murder, the accomplice could be found guilty of a lesser offense. *Id.* at 533, 632 *A.*2d 277; *see also State v. Jackmon,* 305 *N.J.Super.* 274, 286–87, 702 *A.*2d 489 (App.Div.1997). Nor was the jury apprised that defendant could be found guilty of a lesser degree of aggravated assault than the principal. Specifically, the jury was not told that parties who participate in a criminal act may be guilty of different degrees of offense, depending on their own actions. *State v. Bielkiewicz,* 267 *N.J.Super.* at 533, 632 *A.*2d 277. We have said that "[t]hese principles are particularly important where multiple participants engage in a violent attack with the potential for differing states of mind." *State v. Cook,* 300 *N.J.Super.* at 486, 693 *A.*2d 483. In such cases, "[t]he liability of each participant for any ensuing crime is dependent on his own state of mind, not on anyone else's." *State v. Bridges,* 254 *N.J.Super.* 541, 566, 604 *A.*2d 131 (App.Div.1992), *aff'd in part, rev'd in part on other grounds,* 133 *N.J.* 447, 628 *A.*2d 270 (1993); *see also State v. Fair,* 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965).

The trial court's instructions fell afoul of these principles by inextricably linking the criminal liability of the accomplice with the criminal liability of the principal. The trial court charged the jury that it could not find defendant guilty as an accomplice unless it found that he harbored the same state of mind as the actual perpetrator. The jury was told that if defendant purposely solicited or aided "someone else in the commission of the crimes alleged in the indictment, then [it] must consider it as if he committed those crimes himself." Although the trial court gave thorough instructions on all lesser-included offenses, it did not make specific reference to those offenses in the context of its charge on accomplice liability. *See State v. Williams,* 298 *N.J.Super.* 430, 440–41, 689 *A.*2d 821 (App.Div.), *certif. denied,* 150 *N.J.* 27, 695 *A.*2d 669 (1997); *State v. Bielkiewicz,* 267 *N.J.Super.* at

531, 632 *A*.2d 277.   In fact, the court did not mention accomplice liability in instructing the jury on lesser-included crimes.

The faulty instructions on accomplice liability also tainted defendant's conviction for first degree robbery.   In this case, defendant was found guilty of robbery which was elevated to the first degree under *N.J.S.A.* 2C:15–1b because "in the course of committing the theft the [principal] [was] . . . armed with . . . a deadly weapon." Our Supreme Court has recognized that "[i]t is possible for an accomplice to be guilty of robbery and for his compatriot to be guilty of armed robbery." *State v. White,* 98 *N.J.* 122, 130, 484 *A*.2d 691 (1984).   The court's instructions must be carefully crafted to apprise the jury of this principle.   Here, the jury was never instructed that it could find defendant guilty as an accomplice of second degree robbery even though the principal was guilty of armed robbery.

■ Our examination of the record convinces us that these errors had the capacity to lead to an unjust result.   We recognize that the trial court told the jury to consider each charge separately and distinctly, and that accomplice liability may be applicable to some offenses and not to others.   But we are convinced that this oblique and cryptic reference did not sufficiently explain liability where differing culpable mental states were possible.   *See State v. Jackmon,* 305 *N.J.Super.* at 288, 702 *A*.2d 489.   Moreover, as we have noted, other parts of the trial court's instructions tended to indicate that accomplice liability must be predicated upon a finding that the accomplice had the same intent as the principal.   *See State v. Bielkiewicz,* 267 *N.J.Super.* at 532, 632 *A*.2d 277.

We also acknowledge that defendant was tried alone.   The jurors were not charged with the task of determining the code-fendants' guilt.   Under somewhat similar circumstances, our Supreme Court in *State v. Norman,* 151 *N.J.* 5, 697 *A*.2d 511 (1997), said that "it [was], at best, a remote possibility that [the jury was] distracted from [its] task by a conclusion that the principal had possessed a more culpable intent than the accomplice." *Id.* at 39, 697 *A*.2d 511.   However, the Court's observation must be taken

within the context of the overwhelming evidence presented in *Norman* indicating that the defendants shared a murderous intent and that there were no differences in their mental states. In *Norman,* the "[defendants] armed themselves with high-powered guns and set up an ambush." *Id.* at 38, 697 *A.*2d 511. When the ambush was uncovered and the intended victim fled, they pursued, guns in hand, firing numerous shots at the target. *Ibid.* "There [was] simply no reasonable view of the evidence that would permit one to conclude that [the] defendants fired the shots or aided in the firing of the shots with anything less than homicide in mind." *Ibid.*

In contrast, while strong evidence of defendant's guilt was presented in this case, reasonable persons could differ in their perceptions concerning his exact role and level of participation in the criminal events. Ramirez, Torres and Hickman were not stellar witnesses wholly indifferent to the outcome of the trial. With appropriate instructions, the jury could reasonably have found that defendant did not commit the homicidal act and that his state of mind and level of participation warranted conviction of a lesser crime than that committed by one or more of his compatriots. Distinguishable on this basis are *State v. Eure,* 304 *N.J.Super.* 469, 472–73, 701 *A.*2d 464 (App.Div.), *certif. denied,* 152 *N.J.* 193, 704 *A.*2d 23 (1997); *State v. Scherzer,* 301 *N.J.Super.* 363, 472–75, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997); *State v. Williams,* 298 *N.J.Super.* at 440–42, 689 *A.*2d 821; and *State v. Rue,* 296 *N.J.Super.* 108, 114–116, 686 *A.*2d 348 (App.Div.1996), *certif. denied,* 148 *N.J.* 463, 690 *A.*2d 611 (1997).

## III.

The State urges us to reinstate defendant's conviction for felony murder. Where an appellate court reverses a conviction for a crime into which a lesser offense has been merged, the prosecution may elect not to retry the defendant but instead request reinstatement of the merged count. *See State v. Penning-*

*ton,* 273 *N.J.Super.* 289, 295, 641 *A.2d* 1085 (App.Div.), *certif. denied,* 137 *N.J.* 313, 645 *A.2d* 141 (1994); *State v. Brent,* 265 *N.J.Super.* 577, 590, 628 *A.2d* 372 (App.Div.1993), *rev'd on other grounds,* 137 *N.J.* 107, 644 *A.2d* 583 (1994). We, therefore, consider whether the felony murder conviction can be sustained.

At the close of the evidence, the trial court conducted a conference with respect to its proposed jury instructions. In the ensuing colloquy, the prosecutor asked the trial court whether it intended to charge the jury on the "non-slayer" affirmative defense set forth in *N.J.S.A.* 2C:11–3a(3). That section exonerates a defendant from felony murder if he (1) did not commit or assist in the commission of the homicidal act, (2) was not armed with a deadly weapon, (3) had no reasonable ground to believe that any other participant was armed with such a weapon, and (4) had no reasonable ground to believe that another participant intended to engage in conduct likely to result in death or serious physical injury. *Ibid.* Defendant's attorney appeared to be unfamiliar with the defense when asked for his position. Although the defense had not provided the prosecutor with written notice of its intent to rely upon the affirmative defense as required by *R.* 3:12, defendant's attorney, after briefly reviewing *N.J.S.A.* 2C:11–3a(3), asked the court to so instruct the jury.

█ Defense counsel devoted most of his summation to arguing that Hickman, and not defendant, murdered Llorente. We come then to the perplexing manner in which the attorney confronted the felony murder doctrine. Curiously, defense counsel expressly "concede[d] that [defendant was] guilty of [the underlying] robbery." The attorney added that defendant's participation in the robbery of Llorente was "the only part of Mr. Ramirez's testimony that ma[de] sense." Counsel repeated for emphasis that "[defendant], Ramirez, and Hickman went down to roust a man for [twenty-five] cents." While emphasizing that Hickman possessed the knife and committed the fatal stabbing, the attorney also stressed that defendant was a willing participant in the robbery. Later in his comments pertaining to the felony murder doctrine,

defense counsel apparently attempted to retract his earlier conces-
sion. Specifically, the attorney argued that defendant and Ra-
mirez had "le[ft] the scene" and were "around the corner" when
Hickman robbed and stabbed Llorente. However, the damage
had already been done by that point. Indeed, the prosecutor used
defense counsel's concession as the centerpiece of his argument
that, at the very least, defendant was guilty of felony murder.

Defendant argues that he was deprived of the effective assis-
tance of counsel by reason of his trial attorney's highly damaging
concession. We agree. By admitting defendant's guilt of rob-
bery, defense counsel assured his conviction for felony murder.
Had defendant been charged with capital murder, his attorney's
concession could perhaps be viewed as a reasonable strategy
designed to avoid the death penalty. While it is true that by
conceding his guilt of felony murder, defendant could avoid imposi-
tion of a separate, consecutive twenty year sentence on the
merged robbery count, nothing in the record suggests that this
was a deliberate tactical or strategic decision. We do not believe
that defendant suffered this error for tactical or strategic advan-
tage. More likely, counsel's concession constituted an unthinking
blunder. While we have considered remanding the matter for a
hearing to determine what motivated defense counsel in admitting
defendant's guilt of the underlying robbery, we do not deem it a
palliative to explore testimonially the thoughts of trial counsel or
his pertinent conversations with his now unhappy client. Our
experience in that area "suggests such inquiries demean the
attorney-client relationship with no compensating gain." *State v.
Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971). Beyond this, to ask
counsel and defendant to reconstruct their conversations and
decisions now from the vantage point of twenty-twenty hindsight
would be a near impossible task in light of their competing
interests.

We have also considered whether defendant's attorney was
attempting to advance the non-slayer affirmative defense we de-
scribed previously. If defense counsel intended to argue that the

defense was applicable, it was a poor argument indeed. Counsel did not even allude to the defense or the applicable statute. He did not suggest that defendant was unaware Hickman was armed with a knife. Nor did he claim that Hickman's homicidal act was unforeseeable or could not have been reasonably expected. The very fact that we, experienced appellate judges, cannot fathom the meaning of the attorney's meandering statements indicates to us that the jury probably had no greater prescience or interpretative powers to divine the lawyer's intent. Beyond this, it is perfectly evident that defense counsel could have raised the non-slayer affirmative defense without conceding defendant's participation in the robbery. Surely, counsel could have pursued a similar strategy without conceding defendant's guilt.

The law with respect to claims of ineffective assistance of counsel is both clear and well-settled. Our federal and State Constitutions grant a criminal defendant the right to assistance of counsel. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. "The benchmark for judging any claim for ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result." *Strickland v. Washington,* 466 *U.S.* 668, 686, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 692–93 (1984). The *Strickland* Court set forth a two-prong test to determine whether "counsel's assistance was so defective as to require reversal of a [defendant's] conviction." *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; *see United States v. Cronic,* 466 *U.S.* 648, 658, 104 *S.Ct.* 2039, 2046, 80 *L.Ed.*2d 657, 667 (1984) ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). "First, the defendant must show that counsel's performance was deficient." *Strickland v. Washington,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Second, the defendant must show that the performance probably prejudiced the defense. *Ibid.*

■ Applying that standard, we conclude that counsel's representation of defendant was so deficient as to compel a reversal of defendant's conviction for felony murder. A lawyer who informs the jury that there is no reasonable doubt but that his client committed the predicate crime to felony murder has utterly failed to "subject the prosecution's case to meaningful adversarial" scrutiny. *United States v. Swanson,* 943 *F.*2d 1070, 1074 (9th Cir. 1991) (quoting *United States v. Cronic,* 466 *U.S.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 667). Counsel's closing argument was not merely a negligent but harmless misstep in an attempt to champion his client's cause. The concession that defendant was a willing participant in the underlying robbery constituted an abandonment of a significant defense at a critical stage of the criminal proceedings. We cannot say with utmost certainty that defendant would have escaped from criminal liability but for counsel's error. But we stress that the prosecutor took full advantage of counsel's concession, noting that in light of the attorney's remark, defendant's guilt of felony murder was not even open for discussion. We, of course, are not clairvoyant and cannot know what was in the minds of the jurors, but we agree with the prosecutor's assessment. Defense counsel's concession destroyed any lingering possibility that the jury would acquit the defendant.

In light of our disposition of these issues, we need not address defendant's remaining arguments.

The judgment of conviction is reversed, and the matter is remanded for a new trial.