# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1965-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.A.,

     Defendant-Appellant.

_____

Submitted March 5, 2025 – Decided June 30, 2025

Before Judges Sabatino and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 21-04-0254.

Roberts & Teeter, LLC, attorneys for appellant (Michael B. Roberts on the briefs).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Hudson E. Knight, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    Tried by a jury, defendant P.A. appeals his conviction of aggravated

sexual assault and other offenses against a minor, J.E.[1]  We affirm.

I.

Defendant emigrated from Haiti in 2014, settling with a female cousin and her two minor daughters in their Carteret home.  One of the minor daughters, J.E., was born in September 2008.  J.E. alleged that defendant began sexually assaulting her beginning in early 2018, but she refrained from immediately reporting the abuse.  On February 20, 2020, J.E. confided in a school friend. The friend informed the school principal, who alerted the Carteret Police Department (CPD).  On referral from the CPD, the Middlesex County Prosecutor's Office (MCPO) immediately launched an investigation.

In a recorded statement to an investigator the day of reportage, J.E. described how the assaults had occurred.  After bringing her home from school, defendant would tell J.E. to accompany him to the basement.  Once there, he "put his . . . private thing in [her] butt," which she described as "really disgusting" and painful.  J.E. stated that defendant assaulted her in this manner "every [school] day" for "a month and a half" in March and April of 2018 when she was in fourth grade.

---

[1]  We use initials to protect the identities of child victims of sexual assault or abuse.  R. 1:38-3(c)(9) and (12).

<u>Defendant's Statement to Police</u>

On the same evening that J.E. gave her statement, MCPO detectives contacted defendant and asked him to come to CPD headquarters. Defendant drove himself to the station. Although he had been living in the United States for six years and had completed some county college credits, the interview was conducted with assistance from Detective Stenly Vertus, who is fluent in Haitian Creole. During the interrogation, Detective Julissa Alvarado asked questions which Vertus translated into Creole for defendant. Defendant responded in Creole, and Vertus translated his answers back into English for Alvarado.

On the State's notice that it intended to introduce defendant's statement at trial, the court held a <u>Miranda</u>[2] hearing pursuant to <u>Rule</u> 104(c). Detective Vertus testified for the State. A transcript was prepared and played aloud into the record. Concerning <u>Miranda</u> rights, the transcript read:

> DET. ALVARADO: You have the right to remain silent.
>
> DEFENDANT: I understand. But I don't know.
>
> DET. ALVARADO: I can explain.
>
> DEFENDANT: Okay.
>
> DET. ALVARADO: So let's say I'm talking to you --

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-1965-23

DEFENDANT: Okay.

DET. ALVARADO: -- and you say, "I don't want to talk to you," you stay quiet.

DEFENDANT: Oh, no.

DET. ALVARADO: You can stay quiet. You can. It's okay. It's your right.

DEFENDANT: If you ask me a question I have to answer it.

DET. ALVARADO: You can tell me, "I don't want to answer, [detective]."

DEFENDANT: I'm not -- I'm not gonna do that.

DET. ALVARADO: Okay. But you have the right, if you want to. Yeah. That's all.

DEFENDANT: Okay.

DET. ALVARADO: So that is your right. You have the right to remain silent. Do you understand that?

DEFENDANT: I understand.

Defendant responded affirmatively when asked if he understood the statement, "Anything you say can and will be used against you in a court of law." When asked, "You have the right to talk to a lawyer and have the lawyer present while you are being questioned. Do you understand that?" Defendant responded, "Yes. I understand." Afterward, another colloquy ensued:

4

A-1965-23

DET. ALVARADO:  If you cannot afford to hire a lawyer one will be appointed to represent you, if you wish, before any questioning.

DEFENDANT:  Is that -- is that something expensive if I -- if I ever needed one?

DET. ALVARADO: Okay.  So this is -- if you tell me, "I want to get my attorney," that's totally up to you. And I cannot give you any legal advice.  So you decide maybe you want to get an attorney on your own you can.  But I just want to let you know that if you want an attorney now, before I ask you any questions, you have the right to have a lawyer here.

DEFENDANT:  I understand.

DET. ALVARADO:  You understand.  Okay.

DET. VERTUS:  I, pretty much, told him you can -- just like you said, you cannot give legal advice, but if you wish to get an attorney that's his prerogative while he's being questioned. And then -- and then he said that he understood.

DET. ALVARADO: Okay. Number 5, you can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand that?

Defendant was further advised he could exercise these rights at any point.

DEFENDANT:  [I]f I'm ever in your presence I don't answer y'all questions, who's gonna answer the questions for y'all?

ALVARADO:  Nobody. You -- you could just stay quiet and say, "Next question, [detective].  I don't want

5

A-1965-23

to answer."  Or you can just stay quiet or you can say, "I don't want to talk no more."

DEFENDANT:  I don't have any problems.  No matter what question you ask me I got nothing to hide.

With this, the interrogation proceeded.  Defendant initially denied claims of sexual assault.  However, as questioning continued, defendant admitted telling "[J.E.] to bend over" so he could "play a game with [her]," and that by "game" he meant he "grabbed [J.E.'s] butt."  Eventually, defendant admitted, "I put my penis in between [her] butt cheeks" ejaculating onto his hand.  Defendant acknowledged acting in this manner between two and four times and attempted to penetrate J.E.'s vagina "[p]erhaps twice."

The trial court ruled the statement admissible, stating in her oral opinion:

> Here the defendant was clear[ly] in custody when he gave the statement to police.  The [d]etectives followed the dictates of [Miranda], and this [c]ourt finds the statement was voluntary, knowingly, and intelligently made under a totality of the circumstances.  Surrounding the interrogation of the defendant there is no indication that the defendant was intellectually, physically, or emotionally challenged to the extent required to invalidate his [w]aiver of [r]ights. With the benefit of a translator[,] the defendant acknowledged that he understood his rights, memorialized that understanding and chose to speak rather than remain silent.
>
> I do note that there were times during the interview when the interviewer . . . the questions had to be

translated into a language and there is some back and forth. But, if anything in this case, the interviewer, in fact, explained his rights more than once whenever there was any question, at all, about his [Miranda] Rights.

Plea Acceptance and Withdrawal

Defendant was arrested and indicted for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count one); (2) second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count two); and (3) third-degree endangering the welfare of a child, N.J.S.A, 2C:24-4(a)(1) (count three). The State and defendant negotiated a plea agreement providing for defendant to enter a guilty plea to count three. In exchange, the State agreed to dismiss the remaining counts and recommend a term of probation conditioned on 180 days in county jail with Megan's Law registration and compliance. N.J.S.A. 2C:7-1 to -23. With assistance of counsel and an interpreter, defendant entered a guilty plea on August 22, 2022.

Before sentencing one year later, defendant moved to withdraw his plea. In support of the motion, defendant claimed in a certification that his confession had been coerced by J.E.'s mother. Specifically, defendant maintained that J.E.'s mother told him that if he did not admit to the crimes, he "would go away for a long time." The court held a hearing on August 2, 2023. At the hearing, defense

7

counsel stated, "My client . . . has asked me to file this motion, in all candor, against my advice." The State did not file opposition. Finding defendant's motion to be in the interests of justice, the court granted it. R. 3:21-1; R. 3:9-3(e). A pretrial memorandum was completed, and the matter proceeded to trial two months later.

The jury found defendant guilty of all three counts in the indictment. On February 5, 2024, as required by the Lunsford Act, the court sentenced defendant to state prison for a mandatory period of twenty-five years without parole eligibility, Megan's Law registration, parole supervision for life, mandatory fines and penalties. N.J.S.A. 2C:14-2. Concurrent to this sentence, the court imposed concurrent sentences of seven years on count two and four years on count three. The court merged counts one and three. On March 11, 2024, the court prepared an amended judgement of conviction adding a five-year period of parole supervision following defendant's release from prison.

## II.

On appeal, defendant raises five arguments.

POINT I

THE STATE DID NOT PROVE BEYOND A REASONABLE DOUBT DEFENDANT KNOWINGLY WAIVED HIS MIRANDA RIGHTS.

POINT II

REVERSAL IS WARRANTED WHEN THE JURY
CHARGE WAS DEFECTIVE.

A.    The court failed to charge the jury that they must
      disregard [d]efendant's statement if they find it is
      not credible.

B.    The court should have modified the charge for
      aggravated sexual assault and tailored it to the
      facts of the case.

POINT III

THE COURT BELOW ABUSED ITS DISCRETION
IN ALLOWING DEFENDANT TO WITHDRAW HIS
PLEA.

POINT IV

DEFENDANT    WAS    PROVIDED    WITH
CONFLICTING   INFORMATION   AS   TO   HIS
EXPOSURE IF CONVICTED WHICH RENDERS HIS
CONVICTION DEFECTIVE.

POINT V

THE CUMULATIVE ERRORS BELOW VIOLATED
DEFENDANT'S CONSTITUTIONAL RIGHTS.

III.

We address defendant's arguments in the order raised.

A-1965-23

<u>Miranda Hearing</u>

Appellate courts review under "a deferential standard" the trial court's factual findings from a suppression hearing on defendant's self-incrimination claims. <u>State v. Stas</u>, 212 N.J. 37, 48 (2012). Our appellate function is to consider "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." <u>State v. Johnson</u>, 42 N.J. 146, 162 (1964); <u>see also</u> <u>State v. Locurto</u>, 157 N.J. 463, 471 (1999). We owe "deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." <u>Johnson</u>, 42 N.J. at 161. By comparison, "with respect to legal determinations or conclusions reached on the basis of the facts," our review is plenary. <u>Stas</u>, 212 N.J. at 49 (citing <u>State v. Handy</u>, 206 N.J. 39, 45 (2011)).

The basic principles of the <u>Miranda</u> doctrine in safeguarding a defendant's privilege against self-incrimination during a custodial interrogation have been repeatedly expounded in case law and statutes. "The right against self-incrimination . . . guaranteed by the Fifth Amendment to the United States Constitution and this state's common law [is] now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." <u>State v. Diaz</u>, 470 N.J. Super.

10 

495, 402-03 (App. Div. 2022) (quoting State v. S.S., 229 N.J. 360, 381-82 (2017)).

In Miranda, the United States Supreme Court held that to protect the Fifth Amendment right against self-incrimination, a person may not be subjected to custodial interrogation by law enforcement unless apprised of certain rights. Id. at 467. In particular, law enforcement must inform such a person:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
>
> [Id. at 479.]

The procedural safeguards of the Miranda doctrine attach when a criminal suspect is subject to a custodial interrogation. Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Custody does "not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." State v. Godfrey,

131 N.J. Super. 168, 175 (App. Div. 1974) (citations omitted), <u>aff'd o.b.</u>, 67 N.J. 267 (1975).

At the outset, we recognize that defendant travelled to police headquarters at the behest of the police. However, in light of the fact that the police issued <u>Miranda</u> warnings, we concur with the trial court that defendant was "clear[ly] in custody when he gave the statement to police." Administration of <u>Miranda</u> rights was thus required. <u>Miranda</u>, 384 U.S. at 467.

Defendant contends the trial court erred in finding his statement admissible and "failed to make the requisite finding that [d]efendant intelligently and voluntarily waived his rights beyond a reasonable doubt." We are cognizant the trial court did not articulate that waiver of his rights was proved "beyond a reasonable doubt," the required standard under N.J.R.E. 803(c)(25) (hearsay exception, statement against penal interest). We have long held, however, that a court or party need not employ talismanic words or phrases for a decision to be clear or enforceable. Instead, the focus is on whether the ruling, through a thorough and complete explanation, is equivalent to the accepted legal standard. <u>State v. Marshall</u>, 148 N.J. 89, 154 (1997) (holding that "decisions that reflect thoughtful and thorough consideration and disposition of substantive contentions" satisfy the accepted legal standard).

Based on facts adduced during the hearing, the trial court reasonably concluded that defendant's statement "was voluntary, knowingly, and intelligently [made] . . . under a totality of the circumstances. [T]here is no indication that the defendant was intellectually, physically, or emotionally challenged to the extent required to invalidate his [w]aiver of [r]ights." Notwithstanding defendant's countervailing interpretation of certain portions of the dialogue, our review of the record supports the conclusions reached by the trial court. Failure by the court to explicitly state the familiar "beyond a reasonable doubt" standard for a statement's admission does not invalidate its otherwise well-founded legal conclusion.

In this context, we emphasize that defendant's arguments, as contained in the motion to retract his guilty plea, were directed toward alleged undue influence or coercion not from the police, but from J.E.'s mother. Thus, from defendant's perspective, the basis for challenging the voluntariness rests with a third-party whose actions are not governed by Miranda and progeny.

Hampton Charge to the Jury

"Appropriate and proper jury instructions are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). The court must ensure that the jury receives "accurate

instructions on the law as it pertains to the facts and issues of each case." Reddish, 181 N.J. at 613. The jury charge is a critical "road map" to guide the juror's application of the law to the facts. State v. Martin, 119 N.J. 2, 15 (1990). "[W]ithout an appropriate charge a jury can take a wrong turn in its deliberations." Ibid.; see also State v. Fowler, 239 N.J. 171, 192 (2019) (reiterating the important function of the jury charge as a clear roadmap).

The State concedes that the trial court did not provide a jury instruction pursuant to State v. Hampton, 61 N.J. 250 (1972), informing jurors that they must disregard defendant's out-of-court statement if they find it is not credible. However, when, as here, a defendant does not object at trial, the failure to administer a Hampton charge is subject to plain error rule. State v. Jordan, 147 N.J. 409, 427 (1997).

Accordingly, although the plain error standard of R. 2:10-2 applies to our review of the charge, we must assure that a defect in the charge was not apt to have been consequential. Indeed, "[e]rroneous jury instructions on matters material to a jury's deliberations are ordinarily presumed to be reversible error." State v. Jackmon, 305 N.J. Super. 274, 277-78 (App. Div. 1997) (citation omitted). Where a jury charge was "inadequate to guide the jury in the course its deliberation should take," the conviction is to be reversed. Id. at 290.

Moreover, jury charges providing "incorrect instructions of law 'are poor candidates for rehabilitation under the harmless error theory.'" State v. Harrington, 310 N.J. Super. 272, 277 (App. Div.) (quoting State v. Weeks, 107 N.J. 396, 410 (1987)).

Given the strong evidence of guilt and lack of any real dispute regarding the statement's voluntariness, we conclude there is no reasonable likelihood that the omission affected the outcome of the trial, resulted in a miscarriage of justice, or was "clearly capable of producing an unjust result." See again R. 2:10-2; see also State v. Macon, 57 N.J. 325, 336 (1971).

Beyond this, the substance of a Hampton charge is that jurors be told they are to disregard a defendant's statement if they find it not to be credible. As the State argues, the trial court's instruction on the credibility of witnesses as contained in the model jury charge was adequate. Model Jury Charge (Criminal), "Criminal Final Charge - Credibility of Witnesses" (rev. Sept. 1, 2022). That charge explicitly instructs jurors they are to consider numerous aspects of a witness's testimony, including "interest in the outcome of the trial," "means of obtaining knowledge," and "the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence." Most importantly, the jury was instructed:

Through that process you may accept all of it, a portion of it, or none of it. If you believe that any witness or party willfully or knowingly testified falsely to any material facts in the case with intent to deceive you, you may give such weight to his or her testimony as you deem it is entitled. You may believe some of it or you may, in your discretion, disregard all of it.

Given that the jurors were able to consider the statements of the accuser, who was subjected to cross examination, together with the accused's statement, they were in a position to evaluate all aspects of their respective versions of events. Following the model charge, the jurors were aware they could accept or reject, in whole or in part, those competing assertions. State v. Harris, 156 N.J. 122, 183 (1998). Because the unobjected omission of a Hampton charge was not clearly capable of producing an unjust result, reversal is not warranted. See Jordan, 147 N.J. at 425.

Tailored Charge

The court administered the model jury charge for aggravated sexual assault without amplifying it further to relate to the specific facts of the case. Defendant contends the court should instead have administered a charge tailored to anal penetration, arguing in his appellate brief:

Here, the conflicting testimony between the victim and [P.A.] is whether there was anal penetration or just sexual contact by placing his penis within the victim's gluteal cleft. The model charge was insufficient to

16

adequately address this dispute and the court below should have tailored the charge to fit the facts of the case, specifically, by advising the jury that placing the penis between the left and right buttocks is not sufficient to sustain a charge of anal penetration, that actual penetration of the anus, no matter how slight, is necessary.

As we noted above, defendant did not object to the jury charge the court administered. Once more, we apply the plain error rule. R. 2:10-2. The core of defendant's argument on this point is that the model jury charge was inadequate because it did not account for the jury to be advised that "placing the penis between the left and right buttocks is not sufficient to sustain a charge of anal penetration, that actual penetration of the anus, no matter how slight, is necessary." In advancing this argument, defendant relies on State v. Gallagher, where we held that "[w]hile insertion of the penis between the left and right buttocks may be sufficient to prove sexual contact in that there is a touching of the victim's intimate part, it is not sufficient to prove anal intercourse." 286 N.J. Super. 1, 13 (App. Div. 2015). Consequently, because in Gallagher "[t]he evidence [was] clear that the defendant did not penetrate the victim's anus with his penis" and "penetration is a necessary element for a conviction of aggravated sexual assault by anal penetration, the failure to prove penetration [was] fatal to that charge." Id. at 15.

17

Although the evidence in <u>Gallagher</u> was that there was no penetration of the victim's anus, such was not the case here, as evidenced by J.E.'s sworn statement, as read to the jury:

> AGENT:  Okay.  And, um, so you then told me that he put his private spot in your butt.  How did that happen? What did he do?
>
> J.E.:  So he took me (Indiscernible).  He pulled down my pants, and after that he just (Indiscernible).
>
> AGENT:  He just put it in?
>
> J.E.:  Uh-huh.
>
> AGENT:  What did that feel like?
>
> J.E.:  Really disgusting.
>
> AGENT:  It felt really disgusting?
>
> J.E.:  (No audible response).
>
> DET. ALVARADO:  Was it -- when you say that he put his private spot in your butt, was it all the way inside, a little bit inside, something else?
>
> AGENT:  Halfway, you said.  Was that something that -- I know you said it felt disgusting, but was it something that hurt at all, or tickled at all, or anything like that?
>
> J.E.:  Hurt.
>
> . . .

18

A-1965-23

AGENT: And you had said that on the very first time he went to the bathroom after it stopped. Did he ever do anything different? Did he always go to the bathroom after it stopped?

J.E.: (No audible response).

AGENT: How would your butt feel after it stopped? Did it feel weird? I know you said that -- because when I asked you like when it was happening if it hurt or if it tickled, you had said that it hurt. How about afterwards, did it still hurt afterwards or did it feel a different way afterwards?

J.E.: It hurt (Indiscernible).

The foregoing testimony establishes that the model jury charge on penetration was adequate for the proofs advanced. And while the jury charge itself was not included in the record before us, the model charge of second-degree sexual assault would have encompassed a lesser-included offense consistent with defendant's assertion that he did not penetrate J.E.'s anus. This satisfies the precept in Gallagher and our criminal jurisprudence generally, that a defendant "is entitled to a charge on all lesser included offenses supported by the evidence." State v. Short, 131 N.J. 47, 53 (1993).

Withdrawal of Guilty Plea

It is well established that a defendant who wishes to withdraw a guilty plea before sentencing must show a good-faith reason for doing so, convincing

19

the court that allowing withdrawal would serve "the interests of justice." R. 3:21-1; R. 3:9-3(e). After sentencing, a defendant must meet a higher standard, demonstrating that maintaining the plea would result in a "manifest injustice." State v. Slater, 198 N.J. 145, 155-56 (2009). In assessing motions for plea withdrawal filed either before or after sentencing, the court considers four factors: (1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of the reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether the withdrawal would result in unfair prejudice to the State or unfair advantage to the defendant. Id. at 157-58.

Here, the trial court did not undertake a detailed analysis, recite the interests of justice standard, nor cite Slater in granting defendant's motion to retract his plea. But in failing to make a comprehensive ruling, the court did not commit reversible error. The decision to seek withdrawal is the defendant's, and the judge's role is not to decide if such a request is prudent. Our Supreme Court has recognized that "[t]he withdrawal of a guilty plea is . . . a matter within the broad discretion of the trial court." State v. Simon, 161 N.J. 416, 444 (1999).

On review, it is plain that the trial court gave significant weight to defendant's claim of innocence. Defendant now argues his claim of innocence was a mere assertion. However, as argued by counsel, "he only gave that

statement [to police] under a lot of pressure [from J.E.'s mother]." Defendant's claim of innocence was more than mere assertion; there was a feasible rationale behind it, satisfying the first two <u>Slater</u> factors. The State's decision not to object and its readiness to proceed to trial also supported granting the defendant's motion to withdraw his guilty plea under the fourth <u>Slater</u> factor. In sum, we see no abuse of discretion in the court's decision to grant defendant's motion to withdraw his guilty plea.

Penal Exposure

Defendant argues the court erred in conveying contradictory information to defendant about his sentencing exposure if convicted. We see no merit in this argument. On granting defendant's motion to retract his guilty plea, the court proceeded with a pretrial conference as mandated by <u>Rule</u> 3:9-3(g). In the course of that hearing, the court informed defendant his exposure was as much as thirty-five years:

> So in this case, hypothetically, <u>you could be looking at 35 years</u>. There -- if you were convicted of either counts 1 or 2, you'd be subject to what's called the No Early Release Act, which is NERA, and on Count 1, it's what we call a Lunsford Act, <u>which would expose you to at least 25 years in New Jersey [s]tate [p]rison</u>.
>
> [(Emphasis added).]

Defendant observes this information conflicted with the first page of the plea cut-off form, which listed twenty years as defendant's maximum exposure if convicted of aggravated sexual assault. We note the standard maximum exposure for a first-degree crime is twenty years, which may account for the discrepancy. In any event and as acknowledged by defendant in his argument, the contradiction allegedly "had the capacity to create confusion such that [d]efendant may not have understood his trial exposure." (Emphasis added). In other words, this argument rests on potential – not actual – confusion as to what defendant may have thought his penal exposure to be.

Nothing in the record suggests defendant elected to proceed to trial based on an errant conception of the possible sentence upon conviction. To the contrary, the record shows defendant insisted on trial because, as certified in support of the motion to retract his guilty plea, he "maintain[ed] [his] innocence" and wanted his "day in [c]ourt" to "have the opportunity to confront [his] accuser . . . ." Notwithstanding an inaccuracy in the pretrial memorandum, defendant was explicitly advised by the court of potential penal consequences of a guilty verdict, even in excess of those ultimately imposed. As such, we are satisfied the purpose of the proceeding was fulfilled and that defendant proceeded to trial, sufficiently made aware of the possible consequences.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1965-23